J-A08026-16

2016 PA Super 274

| PROFESSIONAL FLOORING COMPANY, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| BUSHAR CORPORATION | |
| APPEAL OF: ROSE LINE, INC. | No. 1594 EDA 2015 |

Appeal from the Order Entered April 21, 2015
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 05-20924

BEFORE: BOWES, OLSON and STRASSBURGER,* JJ.

OPINION BY OLSON, J.:                    **FILED DECEMBER 06, 2016**

Appellant, Rose Line, Inc., appeals from the order entered on April 21, 2015, granting the "Motion for Order Directing Distribution of Certain Escrow Funds Held by Class Action Counsel," which was filed by The Brethren Mutual Insurance Company (hereinafter "Brethren"). After careful consideration, we affirm.

A previous panel of this Court summarized some of the facts that underlie this appeal. We quote the well-written prior opinion and intersperse certain facts that are relevant only to the current appeal:

> [On] May 15, 2001[, a] fire [] destroyed a commercial complex known as the Continental Business Center (the "Business Center") located in Bridgeport, Pennsylvania. Over [70] commercial tenants[, including Appellant,] lost their businesses and hundreds of individuals suffered damages. . . .
>
> [At the time of the fire, Brethren insured Appellant under a business owner's insurance policy. In accordance with the

*Retired Senior Judge assigned to the Superior Court.

insurance policy, Brethren paid Appellant a total of $32,502.67 for losses Appellant sustained as a result of the fire.

Under the insurance policy, Brethren was subrogated to the rights of Appellant to "recover all or part of any payment [Brethren] made under th[e] policy." Commercial Insurance Policy between Appellant and Brethren, from 1/19/02 to 1/19/03, at ¶ J. Further, when Appellant received payment from Brethren, Appellant signed a subrogation receipt which declared:

> [Appellant] covenants and agrees to cooperate fully with [Brethren] in the prosecution of all subrogation claims. . . . It is understood and agreed by the parties hereto that [Appellant] has not been fully indemnified by the above payment and, therefore, will seek full compensation of the damages sustained from third parties responsible therefor. The subrogation rights of [Brethren] are therefore subordinate to the right of [Appellant] to be fully indemnified from the above accident. [Brethren] therefore agrees not to pursue third-party subrogation unless and until [Appellant] has been fully indemnified by said third party. It is specifically understood and agreed by the parties hereto that [Brethren's] subrogation right is subordinate to [Appellant's] right to seek third-party indemnification. [Brethren] agrees not to enter into any settlement with or to receive funds from any third party tortfeasor or any other insurer without the prior written consent of [Appellant].

Subrogation Receipt for Business Income Claims, 1/4/01, at 1; Subrogation Receipt for Business Personal Property and Valuable Papers and Records Claims, 1/4/01, at 1.]

On May 24, 2001, six businesses affected by the fire, Professional Flooring Co. ("Professional"), Limerick Carpet & Flooring, Inc. ("Limerick"), [Appellant], Salmons Industries, Inc. a/t/a Millie Switch ("Salmons"), Renu Electronics, Inc. ("Renu"), and Purdy–Pak, Inc. [a/k/a] Tite Pak, Inc. and PPI ("Purdy–Pak"), commenced a lawsuit in the Court of Common Pleas of Montgomery County by filing a complaint seeking to recover damages both on behalf of themselves

and similarly-situated entities and individuals sustaining damages in connection with the fire. The defendants named in this 2001 complaint included various owners, operators, and managers of the Business Center. After the pleadings were closed, the six plaintiffs filed a motion: 1) seeking class certification pursuant to Pa.R.C.P. 1702; 2) requesting to be named as class representatives; and 3) asking that "the law firms of Kline & Specter, P.C. and High Swartz Roberts & Seidel, LLP be designated as counsel for the class." Memorandum Opinion and Order, 4/14/03, at 2. After appropriate legal analysis, the trial court granted class certification, designated the original six plaintiffs as the class representatives, and held that "Kline & Specter, P.C. and High, Swartz, Roberts & Seidel LLP are found to be adequate and are designated as class counsel." *Id.* at 11. The court included within the class

> All persons and entities who suffered losses resulting from the fire that started on May 15, 2001 in the Continental Business Center situate in Bridgeport, Pennsylvania. Excluded from the class are defendants, additional defendants which may be named later, and their directors, officers, employees, affiliates and subsidiaries, as well as government entities.

*Id.*

The court approved of a notice to each class member about the pendency of the action and concerning each member's ability to opt out of the class action to pursue an individual action for damages sustained in the fire. A packet describing the class action was sent to each class member with notice of their right to opt out of this litigation and to file an individual lawsuit. None of the six original plaintiffs elected to opt out of this action to pursue an individual lawsuit.

Two years later, on May 14, 2003, Professional, Limerick, [Appellant], Salmons, Renu, and Purdy–Pak commenced a separate action in the Court of Common Pleas of Montgomery County against various defendants who were involved in the development, management, control, maintenance, and operation of the Business Center. The 2001 and 2003 lawsuits were then consolidated at docket

- 3 -

number 2005–20924, civil division, in the Court of Common Pleas of Montgomery County.

. . .

In 2006, the class representatives obtained approval to file an amended complaint that included other entities with potential liability for the fire. On July 28, 2006, the class representatives, on behalf of themselves and the class, filed a "Consolidated Amended Class Action Complaint," adding more defendants. Consolidated Amended Class Action Complaint, 7/28/06, at 1, 2. . . . After amendment, there were [37] defendants included within the class action. This lawsuit thereafter became captioned "In re: Bridgeport Fire Litigation." . . .

. . .

As trial approached, [17] defendants remained in th[e class] action. . . . [Prior to trial, 15] defendants settled for $30 million. The trial court preliminarily approved this settlement but deferred a hearing and final ruling as to that matter. Trial against two remaining defendants commenced in March 2008. During the course of trial, one of the defendants settled for $4 million.

Trial continued for several weeks against the sole remaining defendant, Universal Electric. The matter was submitted to the jury, and during deliberations, the jury asked a question that indicated that it had concluded that Universal Electric was not liable. At that point, despite the tenor of the jury's inquiry, class counsel [reached a settlement agreement and] obtained another $1 million from Universal Electric. Thus, the total settlement agreement reached with respect to all defendants amounted to $35 million.

Notice of the settlement was distributed to class members, and a fairness hearing was conducted on June 23, 2008, where all class members were permitted to voice objections. . . .

*In re: Bridgeport Fire Litigation*, 8 A.3d 1270, 1273-1274, 1276-1277, and 1280-1281 (Pa. Super. 2010) (internal footnotes and some internal citations omitted).

The trial court approved the settlement between the class and the settling defendants by order entered July 9, 2008. The trial court's July 9, 2008 order further declared:

> 2. This Order expressly and permanently enjoins all Class Members who have not validly excluded themselves from filing, prosecuting or continuing any related claims or additional lawsuits, claims or causes of action that were, could have been or should have been asserted by the Class against the Settling Defendants based upon or related to damages incurred in connection with the May 15, 2001 fire at the Continental Business Center.
>
> . . .
>
> 4. All Class Members having previously been afforded the opportunity to opt-out of the Class Action shall not be permitted any further opportunity to opt-out of this Settlement. . . .
>
> 5. In connection with the administration of the Settlement, the Claims Administrator shall be required to:
>
> > a. review the claims forms and analyze the completeness of the information contained therein;
> >
> > b. analyze all documents submitted by Class Members in support of their claims to ensure, among other things, their authenticity and completeness;
> >
> > c. determine whether the individual or entity submitting the claim is entitled to recover funds from the Settlement Fund as a Class Member;

d. process and classify the claims forms, thereafter tendering to Class Members the reimbursement to which they are entitled by and from the Settlement;

e. report the results of processing all claims to Class Counsel in a manner and time frame directed by Class Counsel; and

f. file with the [trial c]ourt a full and complete accounting of all funds distributed.

. . .

7. All determinations by the Claims Administrator shall be final and non-appealable.

Trial Court Order, 7/9/08, at 1-2.

Following the trial court's July 9, 2008 order, Appellant submitted a claim form to the court-approved Claims Administrator. Appellant's claim form averred that the May 15, 2001 fire at the Continental Business Center caused it to suffer a total of $378,416.98 in damages. Appellant's Claim Form, 8/29/08, at 1-2. Further, Brethren submitted a "subrogation interest form" to the Claims Administrator, asserting a subrogation lien of $32,503.00 from Appellant's share of the settlement. *See* Letter from Class Counsel to Appellant, 8/18/09, at 1-2.

On August 18, 2009, class counsel wrote a letter to Appellant, informing Appellant:

Following a review and analysis of [Appellant's] claim, the Claims Administrator has awarded [Appellant] $91,099.99 as its net share of the settlement of the Bridgeport Fire Litigation, minus the asserted net subrogation lien that is being withheld, as explained more fully below.

- 6 -

The Claims Administrator found that [Appellant's] total gross loss was $135,205. The sum of all gross awards totaled $32,649,050. Because the total awarded was less than the $35,000,000 settlement amount, $2,350,950 remained to distribute. The Claims Administrator allocated this additional money to all class members proportionally per the [trial c]ourt's order. Each class member's share of this money was based upon the ratio of their gross award in relation to the total amount awarded to all claimants.

The total fees and costs incurred in the prosecution and administration of this case totaled $13,130,930.83. . . . [Appellant's] proportionate share of the fees and costs was determined to be $54,377.31. . . .

In addition, interest has been accruing on the settlement funds. . . . [Appellant's] proportionate share of this accrued interest is $1,559.00. This amount will be added to its net share. . . .

[Appellant's] insurance carrier, Brethren [], has already paid to [Appellant] at least some of the damages it sustained in the fire. [Brethren] has asserted a subrogation lien for reimbursement of this amount, $32,503, from [Appellant's] share of the settlement. It is outside the scope of responsibility of the Claims Administrator to determine what amount, if any, [Brethren] is entitled to receive. Accordingly, the Claims Administrator is withholding $19,430.81, which is the amount of the subrogation lien asserted less [Brethren's] proportional share of the [attorneys'] fees and costs. Please contact Brethren [] to resolve this lien. Please understand that the Claims Administrator is not permitted to assist [Appellant] in this regard.

Enclosed is a Release. By signing the Release, [Appellant] agrees to accept the Claims Administrator's award as full and final settlement of its claims. . . .

Letter from Class Counsel to Appellant, 8/18/09, at 1-2.

On August 20, 2009, Appellant signed the following release:

> I, Arnold Nadler, President of [Appellant,] accept the amount of $91,099.99, plus $1,559.02 interest, as determined by the Claims Administrator, as full and final settlement of any and all claims arising out of the fire at the Continental Business Center on May 15, 2001. I understand that the Claims Administrator's determination is final and non-appealable. [Appellant,] its principals, affiliates and assigns, forever remise, release, discharge and waive its right to pursue any and all claims, objections and appeals relating to the Bridgeport Fire Litigation and the claims administration process. I understand that $19,430.81 is being withheld from distribution pending resolution of my insurance carrier's subrogation lien.

*See* Letter from Class Counsel to Appellant, 8/18/09, at Attached Release; *see also In re: Bridgeport Fire Litigation*, 8 A.3d at 1281.

On April 3, 2015, Brethren filed a "Motion for Order Directing Distribution of Certain Escrow Funds Held by Class Action Counsel" (hereinafter "Brethren's Motion for Order Directing Distribution"). Within the motion, Brethren claimed that it was entitled to the $19,430.81 that was being held in escrow, as it paid Appellant $32,503.00 for losses Appellant sustained in the fire and it, therefore, possessed a valid subrogation lien over this portion of Appellant's award. Brethren's Motion for Order Directing Distribution, 4/3/15, at 1-4.

Appellant responded to Brethren's motion and argued that Brethren was not entitled to the $19,430.81. According to Appellant, Brethren was not entitled to the funds held in escrow because Appellant had not been made whole by the class action payment – and Brethren was not entitled to subrogation unless and until Appellant had been made whole for the losses

Appellant sustained in the fire. Appellant's Response to Brethren's Motion, 4/13/15, at 2.

On April 17, 2015, the trial court held oral argument on Brethren's motion and, at the conclusion of the proceeding, the trial court granted Brethren's motion. The trial court's written order, directing class counsel to distribute the $19,430.81 to Brethren, was entered on April 21, 2015 and Appellant filed a timely notice of appeal. *See* Trial Court Order, 4/21/15, at 1. Appellant raises three issues on appeal:

> [1.] Whether the trial court erred in agreeing with Brethren that it was a third party beneficiary to a settlement release between Appellant [] and various third party tortfeasors sued in the underlying litigation[?]
>
> [2.] Whether the trial court, in granting [Brethren's] Motion for Order Directing Distribution . . . , committed an error of law by disregarding Pennsylvania law, the law of this case, and the contractual agreements of the parties in concluding that [Appellant] was not required to be made whole before Brethren was entitled to subrogation[?]
>
> [3.] Whether the trial court erred in concluding that [Appellant] was made whole when the settlement payments it received did not cover its total loss and expenses incurred by [Appellant] in litigating its claims[?]

Appellant's Brief at 2-3.[1, 2]

_____

[1] Within the trial court's Rule 1925(a) opinion, the court declares that Appellant did not serve the court reporter with notice to transcribe the April 17, 2015 oral argument on Brethren's motion. According to the trial court, it was "unable to prepare an opinion without the transcript" of the April 17, 2015 proceeding and, therefore, all of Appellant's issues "should be deemed waived" on appeal. Trial Court Opinion, 7/15/15, at 1-2. The trial court's
*(Footnote Continued Next Page)*

Before addressing the merits of this appeal, we must address Brethren's claim that Appellant waived its right to challenge the Claims Administrator's "award of funds" to Brethren. According to Brethren, Appellant waived its right to challenge the "award of funds" because Appellant did not opt out of the class action settlement and Appellant "signed a release which expressly stated that [Appellant] accepted the [C]laims [A]dministrator's award and 'waived its right to pursue any and all claims . . . related to . . . the claims administration process.'" Brethren's Brief at 2. Brethren's claim fails.

The meaning of an unambiguous written instrument presents a question of law for resolution by the court and is subject to *de novo* review. ***Seven Springs Farm, Inc. v. Croker***, 801 A.2d 1212, 1216 (Pa. 2002). When the words in a writing are unequivocal, the writing speaks for itself, and a meaning cannot be given to it other than that expressed. ***Marcinak v. S.E. Greene Sch. Dist.***, 544 A.2d 1025, 1027-1028 (Pa. Super. 1988),

---

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

reasoning is mistaken, given that the April 17, 2015 proceeding on Brethren's motion constituted an oral argument and not a hearing; and, since the parties did not present any evidence during the April 17, 2015 oral argument, the trial court should not have needed a transcript to prepare a proper Rule 1925(a) opinion. Further, we note that the April 17, 2015 oral argument transcript is included in the certified record that was forwarded to this Court.

[2] For ease of discussion, we have re-numbered Appellant's claims on appeal.

*quoting* **E. Crossroads Ctr., Inc. v. Mellon-Stuart Co.**, 205 A.2d 865 (Pa. 1965).

Moreover, principles of contract law govern the interpretation and applicability of settlement agreements. **See Pennsbury Vill. Assocs., LLC. v. McIntyre**, 11 A.3d 906, 914 (Pa. 2011). Questions of contract interpretation are matters of law that we review *de novo*. **Tuscarora Wayne Mut. Ins. Co. v. Kadlubosky**, 889 A.2d 557, 560 (Pa. Super. 2005). A court determines the effect of a release from its language, and we give language its ordinary meaning unless the parties clearly intended a different meaning. **In re Estate of Bodnar**, 372 A.2d 746, 748 (Pa. 1977). "A release ordinarily covers only such matters as can fairly be said to have been within the contemplation of the parties when the release was given." **Id.** We must read portions of contractual language interdependently, considering their combined effects in the totality of the document. **Trombetta v. Raymond James Fin. Servs.**, 907 A.2d 550, 560 (Pa. Super. 2006). Additionally, "specific language controls the general." **Id.**

As Brethren notes, the trial court's July 9, 2008 order approved the class settlement and declared:

> 5. In connection with the administration of the Settlement, the Claims Administrator shall be required to:
>
> > a. review the claims forms and analyze the completeness of the information contained therein;

b. analyze all documents submitted by Class Members in support of their claims to ensure, among other things, their authenticity and completeness;

c. determine whether the individual or entity submitting the claim is entitled to recover funds from the Settlement Fund as a Class Member;

d. process and classify the claims forms, thereafter tendering to Class Members the reimbursement to which they are entitled by and from the Settlement;

e. report the results of processing all claims to Class Counsel in a manner and time frame directed by Class Counsel; and

f. file with the [trial c]ourt a full and complete accounting of all funds distributed.

. . .

7. All determinations by the Claims Administrator shall be final and non-appealable.

Trial Court Order, 7/9/08, at 1-2.

Further, on August 20, 2009, Appellant signed the following release:

I, Arnold Nadler, President of [Appellant] accept the amount of $91,099.99, plus $1,559.02 interest, as determined by the Claims Administrator, as full and final settlement of any and all claims arising out of the fire at the Continental Business Center on May 15, 2001. I understand that the Claims Administrator's determination is final and non-appealable. [Appellant,] its principals, affiliates and assigns, forever remise, release, discharge and waive its right to pursue any and all claims, objections and appeals relating to the Bridgeport Fire Litigation and the claims administration process. I understand that $19,430.81 is being withheld from distribution pending resolution of my insurance carrier's subrogation lien.

- 12 -

*See* Letter from Class Counsel to Appellant, 8/18/09, at Attached Release; *see also In re: Bridgeport Fire Litigation*, 8 A.3d at 1281.

According to Brethren, since Appellant did not opt out of the class, it was bound by the trial court's July 9, 2008 order that "[a]ll determinations by the Claims Administrator [are] final and non-appealable." *See* Brethren's Brief at 5 and 8; *see also* Trial Court Order, 7/9/08, at 1-2. Moreover, since Appellant signed the release, Appellant agreed to "forever remise, release, discharge and waive its right to pursue any and all claims, objections and appeals relating to the Bridgeport Fire Litigation and the claims administration process" – including, Brethren claims, the Claims Administrator's "award" of $19,430.81 to Brethren. *See* Brethren's Brief at 8-9; *see also* Letter from Class Counsel to Appellant, 8/18/09, at Attached Release; *see also In re: Bridgeport Fire Litigation*, 8 A.3d at 1281.

Brethren's argument on appeal fails because, under the plain terms of the release, the Claims Administrator did not "award" Brethren the $19,430.81. Instead, the Claims Administrator "withheld" the $19,430.81 from distribution "**pending resolution** of [Brethren's] subrogation lien." Letter from Class Counsel to Appellant, 8/18/09, at Attached Release (emphasis added); *see also In re: Bridgeport Fire Litigation*, 8 A.3d at 1281. The wording of this release expressly contemplates a subsequent resolution of Brethren's subrogation claim through some independent proceeding – and thus contradicts Brethren's position that the Claims Administrator had made a "determination[]" on Brethren's subrogation

claim. *See* Letter from Class Counsel to Appellant, 8/18/09, at Attached Release; *see also In re: Bridgeport Fire Litigation*, 8 A.3d at 1281.

Therefore, under the plain terms of the release, the Claims Administrator did not make a "determination[]" on the propriety of Brethren's subrogation claim and the release expressly contemplated that future proceedings would occur, outside of the claims administration process, to determine Brethren's subrogation claim. As such, Brethren's argument that the Claims Administrator made a final and non-appealable award of its entire subrogation claim by placing the value of the asserted claim in escrow is unavailing. We now proceed to determine Appellant's issues on appeal.

Appellant's first numbered issue on appeal declares that "the trial court erred in agreeing with Brethren that it was a third party beneficiary to a settlement release between Appellant [] and various third party tortfeasors sued in the underlying litigation" and that "the settlement release did not prevent [Appellant] from contesting Brethren's lien." Appellant's Brief at 34-36. We have determined that the Claims Administrator did not make a final determination regarding Brethren's subrogation claim. Therefore, we need not discuss Appellant's first numbered claim further.

Appellant's remaining issues on appeal are essentially singular and may be summarized as follows: the trial court erred in concluding that Appellant's acceptance of its share of the class action settlement made Appellant "whole" for the losses it sustained as a result of the May 15, 2001

fire. Further, Appellant claims that, since it was not made whole, Brethren was not entitled to subrogation and the trial court erred in distributing funds to Brethren.

Our Supreme Court has explained the equitable doctrine of subrogation as follows:

> [the Pennsylvania Supreme Court has] repeatedly held that subrogation is an equitable doctrine intended to place the ultimate burden of a debt upon the party primarily responsible for the loss. Subrogation allows the subrogee (in this case the insurer) to step into the shoes of the subrogor (the insured) to recover from the party that is primarily liable (the third party tortfeasor) any amounts previously paid by the subrogee to the subrogor. . . . As well-stated by the Superior Court,
>
>> [W]hen an individual who has been indemnified for a loss subsequently recovers for the same loss from a third party, equity compels that the indemnifying party be restored that which he paid the injured party; thereby placing the cost of the injury upon the party causing the harm while preventing the injured party from profiting a "double recovery" at the indemnifying party's expense.

*Jones v. Nationwide Prop. & Cas. Ins. Co.*, 32 A.3d 1261, 1270-1271 (Pa. 2011) (some internal citations omitted), *quoting* **Allstate Ins. Co. v. Clarke**, 527 A.2d 1021, 1024 (Pa. Super. 1987).

Subrogation rights may arise by contract or by operation of law, but those rights are always subject to considerations of equity and good conscience. *Jones*, 32 A.3d at 1271. The underlying principle "is that the burden of loss should rest on the party paid to assume the risk, and not on an inadequately compensated insured, who is least able to shoulder the

loss." ***Id.***; ***accord Wimer v. Pa. Employees Benefit Trust Fund***, 939 A.2d 843, 853 (Pa. 2007) (subrogation is enforced to bring about substantial justice, by placing the burden of a debt on the party who in good conscience should pay it). Furthermore, "subrogation is not an inflexible legal concept" but an exercise of equitable powers, and a court is to enforce subrogation interests with "a proper equitable discretion" and "with a due regard for the legal and equitable rights of others." ***Daley-Sand v. W. Am. Ins. Co.***, 564 A.2d 965, 970 (Pa. Super. 1989).

To give effect to these equitable principles, the "made whole" doctrine requires that an insured recover the full amount of its losses before an insurer may pursue recovery under its subrogation rights. ***Heller v. Pa. League of Cities & Municipalities***, 32 A.3d 1213, 1219 n.12 (Pa. 2011). Turning now to that doctrine,

> COUCH ON INSURANCE describes the made whole doctrine as follows: "where an insured is entitled to receive recovery for the same loss from more than one source, *e.g.* the insurer and the tortfeasor, it is only after the insured has been fully compensated for all the loss that the insurer acquires a right to subrogation, or is entitled to enforce its subrogation rights." 16 COUCH ON INSURANCE § 223:134 (3d Ed.) (footnote omitted). Our courts have explained that the made whole doctrine both ensures that the insured is fully compensated for his or her injury before the insurer recovers, in cases where there are insufficient funds to satisfy both the insured and the insurer, and prevents the insured from receiving dual recovery for the same loss from both the tortfeasor and the insurer.

***Jones***, 32 A.3d at 1271 (some citations omitted).

- 16 -

The "made whole" doctrine is controlling law in Pennsylvania. ***Id.*** at 1267 n.5 ("Pennsylvania has applied the 'made whole' doctrine repeatedly"). As applied in this Commonwealth, "equity will not allow the subrogee's claim to be placed ahead of the subrogor's." ***Daley-Sand***, 564 A.2d at 970.

In the instant case, Brethren agreed to subordinate any subrogation claim to Appellant's full recovery by an express term in two subrogation receipts, which read:

> [Appellant] covenants and agrees to cooperate fully with said Insurance Company [Brethren] in the prosecution of all subrogation claims, and to procure and furnish all papers and documents necessary in such proceedings and to attend court and testify if [Brethren] deems such to be necessary, but it is understood that [Appellant] is to be saved harmless from costs in such proceedings. It is understood and agreed by the parties hereto that [Appellant] has not been fully indemnified by the above payment and, therefore, will seek full compensation of the damages sustained from third parties responsible therefor. The subrogation rights of [Brethren] are therefore subordinate to the right of [Appellant] to be fully indemnified from the above accident. [Brethren] therefore agrees not to pursue third-party subrogation unless and until [Appellant] has been fully indemnified by said third party. It is specifically understood and agreed by the parties hereto that [Brethren's] subrogation right is subordinate to [Appellant's] right to seek third-party indemnification. [Brethren] agrees not to enter into any settlement with or to receive funds from any third party tortfeasor or any other insurer without the prior written consent of [Appellant].

Subrogation Receipt for Business Income Claims, 1/4/01, at 1; Subrogation Receipt for Business Personal Property and Valuable Papers and Records Claims, 1/4/01, at 1.

In this case, the "made whole" limitation on Brethren's subrogation interest thus arises both from an express, contractual declaration and by implication under the common law, as a matter of equity and public policy. *See AAA Mid-Atlantic Ins. Co. v. Ryan*, 84 A.3d 626, 634 (Pa. 2014); *Cerankowski v. State Farm Mut. Auto. Ins. Co.*, 783 A.2d 343, 347-348 (Pa. Super. 2001). For these reasons, the "made whole" doctrine is controlling law in this case, and it requires that Appellant recoup the full value of its losses before Brethren may recover. *See Heller*, 32 A.3d at 1219 n.12.

The question on appeal is whether Appellant has been "made whole" by accepting its disbursement from the class settlement. With respect to this issue, Appellant does not question the validity of the settlement, its gross allocation from the settlement fund, or the process by which the Claims Administrator made its allocation. Appellant's Brief at 27-28. Nevertheless, Appellant contends that the disbursement did not fully compensate it for its losses because: 1) Appellant claimed that it suffered $378,416.98 in losses from the fire, but the Claims Administrator only conferred upon Appellant a gross award of $145,477.30 (plus interest)[3] and

---

[3] Within Appellant's brief to this Court, Appellant declares that the Claims Administrator "awarded [Appellant] $135,205 out of the $35 million settlement fund." Appellant's Brief at 5. Appellant is incorrect. As class counsel's letter to Appellant declares:

*(Footnote Continued Next Page)*

*(Footnote Continued)* ———————————

> Following a review and analysis of [Appellant's] claim, the Claims Administrator has awarded [Appellant] $91,099.99 as its net share of the settlement of the Bridgeport Fire Litigation, minus the asserted net subrogation lien that is being withheld, as explained more fully below.
>
> The Claims Administrator found that [Appellant's] total gross loss was $135,205. The sum of all gross awards totaled $32,649,050. Because the total awarded was less than the $35,000,000 settlement amount, $2,350,950 remained to distribute. The Claims Administrator allocated this additional money to all class members proportionally per the [trial c]ourt's order. Each class member's share of this money was based upon the ratio of their gross award in relation to the total amount awarded to all claimants.
>
> The total fees and costs incurred in the prosecution and administration of this case totaled $13,130,930.83. . . . [Appellant's] proportionate share of the fees and costs was determined to be $54,377.31. . . .
>
> In addition, interest has been accruing on the settlement funds. . . . [Appellant's] proportionate share of this accrued interest is $1,559.00. This amount will be added to its net share. . . .

Letter from Class Counsel to Appellant, 8/18/09, at 1-2.

Further, the release declares that Appellant "accept[ed] the amount of $91,099.99, plus $1,559.02 interest, as determined by the Claims Administrator, as full and final settlement of any and all claims arising out the fire at the Continental Business Center on May 15, 2001." **See** Letter from Class Counsel to Appellant, 8/18/09, at Attached Release; **see also In re: Bridgeport Fire Litigation**, 8 A.3d at 1281.

As the letter from class counsel makes clear, the Claims Administrator determined that Appellant suffered a **total gross loss** of $135,205.00. However, since the "sum of all gross awards totaled $32,649,050" – and the total amount of the settlement was $35,000,000.00 – the Claims Administrator still needed to award the additional $2,350,950.00 to the class. The Claims Administrator did so by "allocat[ing the $2,350,950.00] . .

*(Footnote Continued Next Page)*

2) even if the gross award established Appellant's total loss, Brethren is still not entitled to subrogation because "[t]he fees and costs assessed to [Appellant] by the [Claims] Administrator far exceeded" the insurance payment. Appellant's Brief at 26-34. Both of Appellant's claims fail.

The Pennsylvania Supreme Court has held that, for subrogation purposes, where an insured brings suit against a tortfeasor for his "whole loss," "the verdict must be considered as representing the whole loss." *Stoughton v. Mfr.'s Natural Gas Co.*, 30 A. 1001 (Pa. 1895); *see also Gallop v. Rose*, 616 A.2d 1027, 1031 (Pa. Super. 1992) ("[t]hus, [the insurer] had no equitable right to subrogation until [the insured's] total damages were ascertained and recouped, a condition precedent met when the jury returned a verdict of $100,000.00") (internal emphasis omitted). In other words, where an insured sues his tortfeasor for the entirety of his loss

*(Footnote Continued)* _____

. to all class members proportionally per the [trial c]ourt's order." Letter from Class Counsel to Appellant, 8/18/09, at 1-2. The additional amount allocated to Appellant from the remaining $2,350,950.00 was $10,272.30. **See** [$91,099.99[subnote.a] – ($135,205.00[subnote.b] – $54,377.31[subnote.c]) = $10,272.30]. Thus, the Claims Administrator provided Appellant with a total gross award of $145,477.30 (plus interest). **See** [$135,205.00 + $10,272.30 = $145,477.30].

subnote.a. $91,099.99 constitutes Appellant's net share of the entire settlement.

subnote.b. $135,205.00 constitutes Appellant's total gross loss.

subnote.c. $54,377.31 constitutes the attorneys' fees and costs attributable to Appellant's gross share of the entire settlement.

and then receives a verdict or a decision in his favor, the amount of the recovery, *ipso facto*, fully compensates the insured for his losses. Further, since the insured is "made whole" and fully compensated by the verdict, the indemnifying insurer is entitled to enforce its subrogation rights on the recovery – so as to "prevent the insured from receiving dual recovery for the same loss from both the tortfeasor and the insurer." ***See Jones***, 32 A.3d at 1271

In the case at bar, Appellant was a class member in the underlying action and, following the $35,000,000.00 class settlement, the trial court ordered Appellant to participate in a claims process whereby the Claims Administrator would: review Appellant's claims of loss; analyze the documents supporting Appellant's loss claims to ensure "their authenticity and completeness;" and, determine whether and in what amount Appellant was entitled to recover from the settlement fund. Trial Court Order, 7/9/08, at 1-2. Appellant then submitted a claim to the Claims Administrator, averring that it suffered a total of $378,416.98 in damages from the fire. Appellant's Claim Form, 8/29/08, at 1-2. Further, when Appellant submitted its claim, it knew that "[a]ll determinations by the Claims Administrator shall be final and non-appealable." Trial Court Order, 7/9/08, at 1-2.

After reviewing Appellant's claim and supporting documents, the Claims Administrator came to the **factual determination** that Appellant's "**total gross loss** [from the fire] was $135,205." Letter from Class Counsel to Appellant, 8/18/09, at 1-2. Further, the Claims Administrator arrived at

the factual determination that Appellant's total losses were $135,205.00 – and not $378,416.98 – even though the Claims Administrator was not constrained by the total settlement amount. To be sure, the Claims Administrator concluded that the sum of **all** gross awards from the class was $32,649,050.00 – which was $2,350,950.00 **less than** the total settlement amount. Letter from Class Counsel to Appellant, 8/18/09, at 1-2. As such, had the Claims Administrator believed that Appellant's total gross loss exceeded $135,205.00, the Claims Administrator possessed sufficient additional funds to compensate Appellant for the hypothetical, additional loss.

In this case, Appellant was operating under a court-ordered claims process where Appellant sought to recover its entire loss from the fire and where a court-approved Claims Administrator arrived at a factual determination that Appellant's total gross loss from the fire was $135,205.00. Appellant's total loss has thus been ascertained, by the factfinder, to be $135,205.00.

We see no reason to treat this situation any differently than where an insured sues his tortfeasor for the entirety of his loss and then receives a verdict or a decision in his favor. In either case (whether determined by a Claims Administrator under a court-ordered claims process or by a factfinder's verdict or decision following trial), there has been a legally binding determination that the insured suffered a certain, monetary amount of damages – which "must be considered as representing the whole loss."

- 22 -

*Stoughton*, 30 A. at 1001. As such, in accordance with our Supreme Court's precedent, we conclude that the trial court did not err when it held that the Claims Administrator's determination in this case "must be considered as representing [Appellant's] whole loss." *Stoughton*, 30 A. at 1001.[4, 5] Appellant's claim to the contrary fails.

---

[4] Certainly, since the Claims Administrator determined that Appellant's total gross loss from the fire was $135,205.00 (plus interest) and the Claims Administrator ultimately declared that Appellant was entitled to a total gross award of $145,477.30 (plus interest), it is apparent that Appellant was **more than** fully compensated for its losses in this case.

[5] We hold that, in this case, the Claims Administrator's factual assessment of Appellant's total loss is akin to a factfinder's verdict or decision following trial. *See Stoughton*, 30 A. at 1001. Nevertheless, we also note that Pennsylvania courts have held that, "when a subrogor settles instead of pressing his suit against an alleged tortfeasor to verdict, he cannot defeat a subrogee's claim by asserting that his loss exceeded the settlement recovery" and that "[w]hen a subrogor settles, he waives his right to a judicial determination of his losses, and conclusively establishes the settlement amount as full compensation for his damages." *See Associated Hosp. Serv. of Phila. v. Pustilnik*, 396 A.2d 1332, 1337-1338 (Pa. Super. 1979), *vacated on other grounds*, 439 A.2d 1149 (Pa. 1981). Further, although our opinion in *Pustilnik* was vacated by the Pennsylvania Supreme Court on other grounds, the principle espoused in *Pustilnik* stemmed from our Supreme Court's opinion in *Illinois Automobile Insurance Exchange v. Braun*, 124 A. 691 (Pa. 1924), where, following settlement with the tortfeasor, the insureds claimed that they were not made whole because their losses exceeded the settlement amount. The *Braun* Court held: "[w]hile it is true the amount claimed from the [tortfeasor] was greater than the total [the insureds] received from [both the tortfeasor and insurer], the[] [insureds] did not test out what their full loss was by pressing the suit against the [tortfeasor] to verdict, and therefore cannot avail themselves of the principle they seek to invoke. . . . It would never do in administering such an equitable doctrine as subrogation to permit the insured to defeat recovery of any sum from him by his insurer merely by making claim as to his total loss without having his loss ascertained." *Id.* at 693. Moreover, we

*(Footnote Continued Next Page)*

Finally, Appellant claims that, even if the gross award established Appellant's total loss, Brethren is still not entitled to subrogation because "[t]he fees and costs assessed to [Appellant] by the [Claims] Administrator far exceeded" the insurance payment. Appellant's Brief at 26-34. This claim fails.

At the outset, Appellant has cited no binding precedent that would support its claim that it is not responsible for the attorneys' fees and costs that were necessary to produce the class settlement and Appellant's own recovery from the tortfeasors.[6] Moreover, we conclude that Appellant's proposed rule of law would be inequitable and would permit Appellant double recovery. *See Daley-Sand*, 564 A.2d at 969-970 ("[s]ubrogation is an equitable principle. . . . Thus, whatever the contractual language regarding

*(Footnote Continued)* _____

note that, although the Supreme Court vacated our opinion in *Pustilnik* on other grounds, the Supreme Court appeared to agree with our holding in *Pustilnik* that the settlement amount constitutes "full compensation" for an insured's damages. *See Associated Hosp. Serv. of Phila. v. Pustilnik*, 439 A.2d 1149 (Pa. 1981) (vacating the Superior Court opinion, but rejecting the insured's claim that the Superior Court erred "in refusing to reduce Blue Cross's recovery by 50% to reflect the 'doubtfulness' of [the insured's] claim against [the tortfeasor], as the trial court had done;" the Supreme Court held: "[the insured's] contention was properly rejected as meritless by the Superior Court, *see Illinois Automobile Insurance Exchange v. Braun*, 124 A. 691 (Pa. 1924), and does not warrant further discussion"); *see also Allstate Ins. Co. v. Clarke*, 527 A.2d 1021, 1023 (Pa. Super. 1987) (stated in *dicta*).

[6] To support its claim, Appellant has cited to two non-binding opinions from the courts of common pleas. *See Nationwide Mut. Ins. Co. v. Butler*, 28 Pa. D. & C. 3d 627 (Westmoreland Cty. 1983); *Nationwide Mut. Ins. Co. v. Kintz*, 27 Pa. D. & C. 3d 164 (Cumberland Cty. 1983).

subrogation, the equitable nature of subrogation is not altered"); **Clarke**, 527 A.2d at 1024 (subrogation is intended to "prevent[] the injured party from profiting a 'double recovery' at the indemnifying party's expense").

The class in this case was defined as:

> All persons and entities who suffered losses resulting from the fire that started on May 15, 2001 in the Continental Business Center situate in Bridgeport, Pennsylvania. Excluded from the class are defendants, additional defendants which may be named later, and their directors, officers, employees, affiliates and subsidiaries, as well as government entities.

**In re: Bridgeport Fire Litigation**, 8 A.3d at 1274.

Both Appellant and Brethren "suffered losses resulting from the [May 15, 2001] fire," since Appellant suffered its losses directly from the fire and Brethren suffered a monetary loss when it paid Appellant for the insured damages under the policy. Thus, contrary to Appellant's claims in its reply brief, both Appellant and Brethren were members of the same class. **See also** Trial Court Order, 9/22/04, at 1 (granting Appellant's petition to strike Brethren's opt-out of the class); Trial Court Opinion, 12/9/04, at 1-14.[7]

Given that both Appellant and Brethren were part of the same class, both Appellant and Brethren benefitted from class counsel's work (and

---

[7] Not only does Brethren meet the class definition, but the trial court struck Brethren's attempt to opt-out of the class after Appellant opposed the effort. Trial Court Order, 9/22/04, at 1 (granting Appellant's petition to strike Brethren's opt-out of the class); Trial Court Opinion, 12/9/04, at 1-14.

associated costs) in creating the $35,000,000.00 common fund – and in creating the total gross award of $145,477.30 (plus interest) to Appellant, subject to Brethren's subrogation lien $32,503.00. **_See Estate of Wanamaker_**, 460 A.2d 824, 825 (Pa. Super. 1983) ("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. . . . The common-fund doctrine reflects the traditional practice in courts of equity . . . and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees. . . . The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense") (_quoting_ **_The Boeing Co. v. Van Gemert_**, 444 U.S. 472 (1980)). As such, the only equitable result was for Appellant and Brethren to pay a _pro rata_ share of the attorneys' fees and costs.[8] Certainly, any other holding would necessarily result in Brethren

_____

[8] As noted, the Claims Administrator conferred upon Appellant a total gross award of $145,477.30 (plus interest) and Brethren asserted a total subrogation lien of $32,503.00 from this share. Thus, after subtracting Brethren's lien, Appellant's gross share was $112,974.30 (plus interest). In ordering the net distribution of $19,430.81 to Brethren, the trial court required that both Brethren and Appellant bear their proportional share of the attorneys' fees and costs that were attributable to the total gross award. Thus, of the $54,377.31 in attorneys' fees and costs attributable to the total gross award of $145,477.30, Brethren paid $13,072.19 (which is approximately 40% of its $32,503.00 gross share in attorneys' fees and costs) and Appellant paid $41,305.12 (which is approximately 36% of its $112,974.30 gross share in attorneys' fees and costs).

paying Appellant's share of the attorneys' fees and costs that were necessary to obtain the class settlement and Appellant's own gross award – which Brethren was neither statutorily nor contractually obliged to do. This would, by definition, permit Appellant double recovery at the expense of the indemnifying insurer and, thus, run contrary to the equitable principles that underlie the doctrine of subrogation.

Therefore, since the equitable result required that Appellant and Brethren pay their *pro rata* shares of the attorneys' fees and costs – and since "[s]ubrogation is an equitable principle" – we conclude that the trial court properly rejected Appellant's claim that it was not made whole because "[t]he fees and costs assessed to [Appellant] by the [Claims] Administrator far exceeded" the insurance payment.

Judgment affirmed. Jurisdiction relinquished.

Bowes, J., joins this Opinion.

Strassburger, J., files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/6/2016

- 27 -