J-A27022-20

2022 PA Super 69

| | | |
|---|---|---|
| FREDERICK E. OBERHOLZER, JR AND DENISE L. OBERHOLZER | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| SIMON AND TOBY GALAPO | : : | |
| Appellant | : : | No. 794 EDA 2020 |

Appeal from the Judgment Entered April 1, 2020
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  No. 2016-11267

BEFORE: STABILE, J., NICHOLS, J., and COLINS, J.*

OPINION BY NICHOLS, J.:                          **FILED APRIL 18, 2022**

Appellants Simon and Toby Galapo (individually, Appellant Husband and Appellant Wife) appeal from the judgment entered in favor of Appellees Frederick E. Oberholzer, Jr., and Denise L. Oberholzer (individually, Appellee Husband and Appellee Wife).  Appellants challenge the injunction entered against them and in favor of Appellees as an unconstitutional restraint on Appellants' right to free speech.  We vacate and remand for further proceedings, as set forth in detail below.

## Procedural and Factual History

We briefly summarize the relevant facts and procedural history of this case.  Appellants and Appellees are neighbors in Abington Township.  Specifically, the backyards of the parties' respective properties abut each

---

* Retired Senior Judge assigned to the Superior Court.

other and are separated by a creek. Am. Compl., 7/5/16, at 2-3, R.R. 13a-14a.[1] In November 2014, Appellants allegedly began landscaping their yard during the evening hours in violation of a township noise ordinance. *Id.* Appellees eventually complained to the township and the evening noises temporarily ceased. *Id.*

On November 22, 2014, Appellant Husband confronted Appellees about a resurveyed property line. Trial Ct. Op. & Order, 9/12/19, at 3, R.R. at 620a. During the ensuing argument, Appellant Husband alleged that Appellee Wife called him a "f***ing Jew." Ex. B to Appellants' Mot. for Summary J., 7/9/18, at 4, R.R. at 39a. Appellants subsequently filed a police report, but it was determined that no further police action was warranted. Trial Ct. Op. & Order, 9/12/19, at 3, R.R. at 620a.

Starting in June 2015, Appellants erected signs on their property, which included primarily anti-hate and anti-racist statements. *Id.* Appellants' signs contained the following statements:

1.  No Place 4 Racism

2.  Hitler Eichmann Racists

3.  Racists: the true enemies of FREEDOM

4.  No Trespassing - Violators Will Be Prosecuted

5.  Warning! Audio & Video Surveillance On Duty At All Times

6.  Racism = Ignorant

---

[1] We may refer to the reproduced record for the parties' convenience.

7.   ✡ Never Again

8.   WWII: 1,500,000 children butchered: Racism

9.   Look Down on Racism

10.   Racist Acts will be met with Signs of Defiance

11.   Racism Against Kids Is Not Strength, It's Predatory

12.   Woe to the Racists. Woe to the Neighbors

13.   Got Racism?

14.   Every Racist Action Must be Met With a Sign of Defiance

15.   Racism is Self-Hating; "Love thy Neighbor as Thyself"

16.   Racism - Ignore It and It Won't Go Away

17.   Racism - The Maximum of Hatred for the Minimum of Reason

18.   RACISM: It's Like a Virus, It Destroys Societies

19.   Racists Don't Discriminate Whom They Hate

20.   Hate Has No Home Here [in multiple languages]

21.   Every Racist Action Must Have an Opposite and Stronger Reaction

22.   Quarantine Racism and Society Has a Chance

23.   Racism Knows No Boundaries

Confidential Settlement Agreement, 6/5/19, at 4-5, R.R. at 434a-35a;[2] Am.

Compl., at 2-8, R.R. at 13a-19a; Trial Ct. Op., 1/3/20, at 1 n.1, R.R. at 660a;

---

[2] Confidential portions of the parties' settlement agreement are not quoted and are not at issue.

*see also* R.R. at 2b-31b (color photographs of some of the signs at issue).

As of June 2016, Appellants posted twenty-three signs on their property, all of which were placed facing towards and in the line of sight of the backyard of Appellees' property. Confidential Settlement Agreement, 6/5/19, at 4-5, R.R. at 434a-35a; Am. Compl., at 2-8, R.R. at 13a-19a.

On June 7, 2016, Appellees filed a complaint, which they amended on July 5, 2016. Trial Ct. Op. & Order, 9/12/19, at 3, R.R. at 620a. Appellees pleaded five causes of action: (1) private nuisance; (2) intrusion upon seclusion; (3) defamation—libel and slander; (4) intentional infliction of emotional distress; and (5) publicity placing Appellees in a false light. Am. Compl., at 1-20, R.R. at 12a-31a. Additionally, Appellees sought a preliminary and permanent injunction against Appellants from continuing to post their signs. *Id.*

On August 29, 2016, the parties entered into a consent order in which Appellants agreed to remove the signs pending the outcome of the hearing for a preliminary injunction. Trial Ct. Op. & Order, 9/12/19, at 4, R.R. at 621a. On October 31, 2016, the parties stipulated to extend this consent order. *Id.* On November 17, 2016, the trial court denied Appellees' request for a preliminary injunction. *Id.*

Subsequently, the parties filed cross-motions for summary judgment. Trial Ct. Op. & Order, 9/12/19, at 4, R.R. at 621a. On September 6, 2018, the trial court issued a responsive order that granted in part and denied in

part Appellants' motion for summary judgment. Order, 9/6/18, R.R. at 429a. Specifically, the trial court dismissed Appellees' claim for intrusion on seclusion and denied Appellants' motion in all other respects. *Id.* The trial court also denied Appellees' cross-motion for summary judgment. *Id.*

On June 5, 2019, the parties entered into a confidential settlement agreement resolving the remaining claims at law while leaving the issue of permanent injunctive relief for the trial court to decide. Trial Ct. Op. & Order, 9/12/19, at 4, R.R. at 621a; Confidential Settlement Agreement, 6/5/19, at 1-12, R.R. at 431a-42a; N.T. Settlement Agreement H'rg, 6/5/19, at 3-4. The settlement agreement provided, in relevant part, that:

> Notwithstanding the provisions in the preceding paragraphs, this Agreement does not prohibit, limit or affect [Appellees'] rights to seek and/or pursue their claim in equity for injunctive relief against [Appellants] in this action (no. 2016-11267) prohibiting the present and/or future posting of signs on [Appellants'] property enumerated specifically in paragraph 5 of this Agreement, including a final decree with respect thereto, which claim is specifically not released in this Agreement. Although [Appellants] do not admit any wrongdoing or liability herein, [Appellants] agree they will not contest [Appellees'] request for injunctive relief on the grounds [Appellees] have failed to succeed on the merits of their claim for such relief.

Confidential Settlement Agreement, at 5, R.R. at 435a.

The parties stipulated that the trial court would consider various deposition transcripts, the preliminary injunction transcript, and selected exhibits in resolving Appellees' request for permanent injunctive relief. Trial Ct. Op. & Order, 9/12/19, at 4-5, R.R. at 621a-22a. On August 13, 2019, the trial court heard oral argument. N.T., 8/13/19, at 2-97, R.R at 505a-600a.

On September 12, 2019, the trial court entered an order granting Appellees' request for a permanent injunction in part. Trial Ct. Op. & Order, 9/12/19, at 1, R.R. at 618a. The trial court summarized Appellant Husband's preliminary injunction testimony that the signs targeted Appellees:

> [Appellant Husband] testified that the purpose of the signs was "to protest behavior which we perceive as being racist towards myself, my wife, and my family." [Appellant Husband] was also clear that the signs are directed at [Appellees] and their property and would only come down when the racist behavior of [Appellees] as he perceived it ceased. When questioned regarding the position of the signs only being in the backyard facing [Appellees'] home and not anywhere else, [Appellant Husband] indicated that the greatest threat to him and his family with regard to racism was [Appellees]. These beliefs were further cemented during oral arguments regarding the petition to grant a permanent injunction in which [Appellant Husband's] counsel indicated that this was a personal protest for [Appellant Husband] against his backdoor neighbors, [Appellees].

*Id.* at 8-9, R.R. at 625a-26a (citations omitted); *accord* Ex. E to Appellants' Mot. for Summary J., at 41 (agreeing that signs were directed to Appellees and their property), 47, 54 (testifying that the signs were directed to Appellees and about the Appellees), 61, R.R. at 244a, 250a, 257a, 264a.[3]

The trial court concluded that Appellants'

acts were done as a personal protest against [Appellees]. The personal and specific messages of the signs are for the alleged

---

[3] We add that Appellant Husband also testified that Appellees were racist and that racism led to the killing of the Jewish people. Ex. E to Appellants' Mot. for Summary J., at 40, 45, R.R. at 243a, 248a. Appellant Husband additionally testified that at least one of the signs could be seen from the sidewalk in front of Appellees' home or anyone driving by Appellees' home. *Id.* at 35-36, 41, R.R. at 238a-39a, 244a. We acknowledge that the trial court did not reference any of this testimony in granting Appellees' request for injunctive relief.

racist behavior exhibited by [Appellees], not racism generally existing in society. The placement of the signs indicates that [Appellant Husband] is targeting specific individuals with the signs that decry their perceived racist behavior.

Trial Ct. Op. & Order, 9/12/19, at 9, R.R. at 626a. As a result, the trial court ordered Appellants to position their signs in such a way so that they did not face Appellees' property. *Id.*

The trial court justified the injunction for the following reasons: "(1) [Appellees] have no adequate remedy at law; and (2) that a greater injury of a continuing intrusion on [Appellees'] residential privacy will result from refusing to grant the equitable relief sought and allowing the existing signs to remain as they are presently positioned on the [Appellants'] property." *Id.* at 8, R.R. at 625a. Ultimately, the trial court concluded that because Appellants infringed on Appellees' right to privacy and quiet enjoyment of their residential home, a time, place, and manner restriction on Appellants' speech was permissible. *Id.* at 9-11, R.R. at 626a-28a.

However, the trial court did not enjoin the content of Appellants' signs because under Pennsylvania law, "equity lacks the power to enjoin the publication of defamatory matter where an injunction would be an unconstitutional prior restraint on freedom of expression." *Id.* at 12, R.R. at 629a (citing ***Willing v. Mazzocone***, 393 A.2d 1155 (Pa. 1978) (plurality)).

On September 23, 2019, Appellees filed a petition to hold Appellants in civil contempt in which they asserted that although Appellants had turned the signs to face the other direction, the text was still visible to Appellees from

their property. Pet. for Civ. Contempt, 9/23/19, R.R. at 761a-82a. After a hearing, the trial court did not hold the Appellants in contempt, but on October 11, 2019, the trial court amended its initial order granting the injunction in part to require Appellants' signs be constructed of opaque materials. Am. Order, 10/11/19, R.R. at 631a. The order provided as follows:

A) The signs posted by [Appellants] on their property are allowed to remain;

B) The signs previously posted on [Appellants'] property shall be positioned in such a way that they do not directly face [Appellees'] property; *i.e.*, the fronts of the signs (lettering, etc.) are not to be visible to [Appellees] nor face in the direction of [Appellees'] home. In order to ensure that none of the signs are visible regardless of their positioning, these signs shall be constructed with opaque material.

*Id.* (formatting altered).

Meanwhile, Appellants filed a timely motion for post-trial relief on September 20, 2019.[4] Appellants' Mot. for Post-Trial Relief, 9/20/19, R.R. at 632a-58a. The trial court denied Appellants' motion for post-trial relief on January 3, 2020. Order, 1/3/20, R.R. at 659a. The trial court's order did not enter judgment. *Id.* The trial court explained that "when a citizen's exercise of their right to freedom of speech substantially impacts another citizen's private civil rights, that speech constitutes expressive activity and such

---

[4] "Filing an immediate appeal from an injunction under [Pa.R.A.P.] 311(a)(4) is not mandatory, and an appellant may elect instead to engage in normal post-trial procedures and then appeal from a final judgment. *See* Pa.R.A.P. 311(g)." *Thomas A. Robinson Family Ltd. P'ship v. Bioni*, 178 A.3d 839, 847 n.11 (Pa. Super. 2017) (*Bioni*).

expressive activity may be subject to reasonable time, place and manner restrictions" and that its injunction contained permissible time, place, and manner restrictions on Appellants that did not regulate the content of their signs. Trial Ct. Op., 1/3/20, at 3-4, R.R. at 662a-63a.

Appellants timely filed a notice of appeal on January 9, 2020, and filed a timely court-ordered Pa.R.A.P. 1925(b) statement. On March 12, 2020, the trial court filed a Rule 1925(a) opinion that incorporated its January 3, 2020 opinion and order, October 11, 2019 order, and September 12, 2019 opinion and order. Trial Ct. Op., 3/12/20.

On March 31, 2020, this Court issued a rule to show cause why this appeal should not be quashed as no judgment had been entered below. Appellants filed a response to the rule to show cause on April 16, 2020. The response contained a copy of the trial court docket indicating that judgment had been entered on April 1, 2020. This Court discharged the rule to show cause on April 20, 2020. *See* Order, 4/20/20.

On appeal, Appellant raises the following issues for our review:

1. Did the trial court commit an error of law by improperly concluding that an injunction was necessary to prevent a legal wrong for which there is no adequate redress at law?

2. Did the trial court commit an error of law by improperly concluding that injunctive relief is permissible under Article I, Section 7 of the Pennsylvania Constitution?

3. Did the trial court commit an error of law by entering a content-based injunction that is not narrowly tailored to serve a compelling governmental interest?

- 9 -

4. Did the trial court commit an error of law by entering an injunction that fails to further an important or substantial governmental interest, is not narrowly tailored, and/or does not leave open ample alternative channels for communication?

Appellants' Brief at 4 (formatting altered).

All of Appellant's issues involve challenges to the trial court's entry of permanent injunctive relief. A permanent injunction is a permanent order requiring an individual or entity to comply with mandatory conditions imposed by the court. *See, e.g., Kuznik v. Westmoreland County Board of Commissioners*, 902 A.2d 476 (Pa. 2006); *Thomas A. Robinson Family Limited Partnership v. Bioni*, 178 A.3d 839 (Pa. Super. 2017). Additionally, a permanent injunction may be granted only where: 1) the party seeking the injunction has established that its right to relief is clear; 2) an injunction is necessary to avoid an injury where there no adequate remedy at law, *i.e.*, damages will not compensate for the injury; and 3) a greater injury will result from refusing rather than granting injunctive relief. *Kuznik*, 902 A.2d at 489 (Pa. 2006); *see also Liberty Place Retail Associates, L.P. v. Israelite School of Universal Practical Knowledge*, 102 A.3d 501, 505-06 (Pa. Super. 2014). Unlike a preliminary injunction, a permanent injunction does not require proof of immediate irreparable harm. *Morgan v. Millstone Resources Ltd.*, 267 A.3d 1235, 1249 (Pa. Super. 2021). With these principles in mind, we now proceed to discuss the merits of Appellants' claims.

## 1. Adequate Remedy at Law

Appellants raise two arguments that the trial court erred by granting a permanent injunction in favor of Appellees: (1) Appellees have an adequate remedy at law that precludes any award of injunctive relief, and (2) regardless, the parties' settlement agreement permitted Appellants to challenge Appellees' request for injunctive relief on two of the three elements required for a grant of injunctive relief. *Id.* at 17, 22, 24.

First, Appellants note that the settlement agreement provided that Appellants would pay Appellees to compensate Appellees "for past, present and **future** damages suffered as a result of the posting of the signs." *Id.* at 19. Appellants reason that because Appellees have received monetary compensation, an adequate remedy at law exists. *Id.* at 20. Appellants explain that because (1) Appellees have an adequate remedy at law, and (2) Appellees actually "received an adequate remedy in the form of monetary compensation," Appellees "are not entitled to permanent injunctive relief." *Id.* at 20-21.

Second, Appellants further claim that under the parties' settlement agreement, Appellants agreed to "refrain from arguing that [Appellees] failed to satisfy the first requirement for permanent injunctive relief: the clear right to relief." *Id.* at 23-24. Appellants, therefore, reason that they could challenge whether Appellees proved the other two requirements for permanent injunctive relief, including the third prong "that greater injury will

- 11 -

result from refusing [injunctive relief] rather than granting the relief requested." *Id.* at 24. Appellants explain that their remaining issues, which are based on Article I, Section 7 of the Pennsylvania Constitution, "undoubtedly contests the merits of injunctive relief" under the third prong. *Id.*

Appellees counter that the parties' settlement agreement expressly reserved their right to pursue injunctive relief notwithstanding the settlement and release of all claims at law. Appellees' Brief at 12. Appellees quote the clause of the parties' settlement agreement that Appellants "agree they will not contest [Appellees'] request for injunctive relief on the grounds [Appellees] have failed to succeed on the merits of their claim for such relief." *Id.* (formatting altered). The trial court's opinion did not directly address this issue.

In reviewing Appellant's claims, we are guided by the following principles. In *Bioni*, we stated the standard of review:

> The grant or denial of a permanent injunction is a question of law. Regarding the trial court's legal determination, our standard of review is *de novo*, and our scope of review is plenary. As in all equity matters, however, we must accept the trial court's factual findings and give them the weight of a jury verdict where they are supported by competent evidence.

*Bioni*, 178 A.3d at 843 (citation omitted); *see also Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765-66 (1994) (discussing standard of review for content-neutral injunction).

- 12 -

In ***Professional Flooring Co. v. Bushar Corp.***, 152 A.3d 292 (Pa. Super. 2016), this Court stated the following in construing a settlement agreement:

> The meaning of an unambiguous written instrument presents a question of law for resolution by the court and is subject to *de novo* review. When the words in a writing are unequivocal, the writing speaks for itself, and a meaning cannot be given to it other than that expressed.
>
> Moreover, principles of contract law govern the interpretation and applicability of settlement agreements. Questions of contract interpretation are matters of law that we review *de novo*. A court determines the effect of a release from its language, and we give language its ordinary meaning unless the parties clearly intended a different meaning. A release ordinarily covers only such matters as can fairly be said to have been within the contemplation of the parties when the release was given. We must read portions of contractual language interdependently, considering their combined effects in the totality of the document. Additionally, specific language controls the general.

***Professional Flooring***, 152 A.3d at 299-300 (citations omitted and formatting altered). We add that injunctive relief is an equitable remedy that "will lie where there is no adequate remedy at law." ***SLT Holdings, LLC v. Mitch-Well Energy, Inc.***, 249 A.3d 888, 894-95 (Pa. 2021) (citation omitted and formatting altered).

Here, Appellants' first argument does not address the import of the clause in the parties' settlement agreement:

> Agreement does not prohibit, limit or affect [Appellees'] rights to seek and/or pursue their claim in equity for injunctive relief against [Appellants] in this action prohibiting the present and/or future posting of signs on [Appellants'] property . . . , which claim is specifically not released in this Agreement. Although [Appellants] do not admit any wrongdoing or liability herein,

- 13 -

> [Appellants] agree they will not contest [Appellees'] request for injunctive relief on the grounds [Appellees] have failed to succeed on the merits of their claim for such relief.

R.R. at 435a.

Upon giving the above release language its ordinary meaning, the parties unequivocally agreed that Appellees could pursue injunctive relief notwithstanding any monetary payments by Appellants. *See **Professional Flooring***, 152 A.3d at 299-300. Moreover, Appellants' argument that Appellees have an adequate remedy at law and that injunctive relief is an equitable remedy unavailable in actions at law is meritless. *See **SLT Holdings***, 249 A.3d at 894-95. In sum, we conclude that the parties' settlement agreement did not bar Appellees from pursuing injunctive relief adverse to Appellants.

## 2. Enjoining Defamation Under the Pennsylvania Constitution

Appellants next argue that an injunction cannot enjoin defamation. Appellants' Brief at 25-27. Appellants reason that Article I, Section 7 of the Pennsylvania Constitution prohibits prior restraints on communication. *Id.* at 26. Appellants explain that because defamation is a form of communication, an injunction on defamation is an impermissible prior restraint. *Id.* at 27 (summarizing ***Willing***, 393 A.2d 1155). Appellants summarize Pennsylvania federal court cases in support of its position. *Id.* at 28-32. Appellants conclude that the instant "restriction of speech via injunction constitutes an impermissible prior restraint of speech." *Id.* at 32. Therefore, Appellants

argue that the trial court cannot limit their posting of signs on their property, "even if those signs are defamatory or place [Appellees] in false light." *Id.* at 33.

Appellees counter that they did not pursue injunctive relief on defamation, as Appellees released that claim. Appellees' Brief at 16. Further, in Appellees' view, Appellants' signs were not "content-driven speech, but solely to torment and invade" Appellees' right to privacy and right to seclusion. *Id.* at 17. Appellees explain that the injunction is not a prior restraint because the parties' settlement agreement explicitly listed the signs that Appellants agreed Appellees could challenge. *Id.* at 20. Appellees reiterate the trial court's reasoning that Appellants' signs were a "personal protest" and therefore not content-driven speech. *Id.* at 21.

The trial court reasoned that because it did not issue a "blanket injunction prohibiting all freedom of expression," it did not impose an impermissible prior restraint. Trial Ct. Op. & Order, 9/12/19, at 12, R.R. at 629a.

Article I, Section 7 of the Pennsylvania Constitution states in relevant part that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. . . ." Pa. Const. Art. I, § 7. It "provides protection for freedom of expression that is broader than the federal constitutional guarantee." *Pap's A.M. v. City of Erie*, 812

- 15 -

A.2d 591, 605 (Pa. 2002) (citations omitted and formatting altered). Specifically, it "prohibit[s] the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege." *William Goldman Theatres, Inc. v. Dana*, 173 A.2d 59, 62 (Pa. 1961).

For example, in *Phila. Newspapers, Inc. v. Jerome*, 387 A.2d 425 (Pa. 1978), our Supreme Court defined a prior restraint as a court order that "prevents publication of information or material in the possession of the press . . . ." *Jerome*, 387 A.2d at 432 (citations omitted). A court order that does "not prevent petitioners from publishing any information in their possession or from writing whatever they pleased" does "not constitute a prior restraint upon publication." *Id.* at 433 (footnote omitted); *accord Commonwealth v. Genovese*, 487 A.2d 364, 366, 369 (Pa. Super. 1985) (holding that a court order preventing the press "from publishing information obtained during a public trial," was a prior restraint).

A prior restraint was also at issue in *Willing*, in which the defendant had hired the plaintiffs as her counsel in an underlying lawsuit, who then obtained a favorable settlement. *Willing*, 393 A.2d at 1156. The plaintiffs deducted from the settlement amount the costs of the case, including an expert witness fee that was actually disbursed to that witness. *Id.* The defendant, believing that the plaintiffs wrongfully retained a portion of the expert witness fee, started marching for several hours each day next to the

court buildings where plaintiffs practiced. *Id.* at 1156-57. The defendant "wore a sandwich-board sign around her neck" asserting that the plaintiffs' law firm stole money from her, pushed a shopping cart with the American flag, and "continuously rang a cow bell and blew on a whistle to further attract attention." *Id.* at 1156 (formatting altered).

The plaintiffs moved for injunctive relief against the defendant, which the trial court granted and enjoined the defendant from "further unlawful demonstration, picketing, carrying placards which contain defamatory and libelous statements and or uttering, publishing and declaring defamatory statements" against plaintiffs. *Id.* at 1157. The defendant appealed to this Court, which affirmed but it modified the trial court's order to enjoin the defendant from "demonstrating against and/or picketing" plaintiffs by "uttering or publishing statements to the effect" that plaintiffs stole money from her. *Id.* (citation omitted). In other words, the courts enjoined the defendant from expressing, from that date on forward, her view that plaintiffs stole money. *See id.* The defendant appealed to our Supreme Court, which reversed in a plurality decision. *Id.* at 1156. The *Willing* Court reasoned that the state constitution prohibited prior restraint of even a defamatory matter. *Id.* at 1158.

The Pennsylvania state law definition of a "prior restraint" is also mirrored in federal jurisprudence. For example, in *Alexander v. United*

*States*, 509 U.S. 544 (1993), the United States Supreme Court explained as

follows:

> The term prior restraint is used to describe administrative and judicial orders **forbidding** certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints. This understanding of what constitutes a prior restraint is borne out by our cases . . . . In ***Near v. Minnesota ex rel. Olson***, [283 U.S. 697 (1931)], we invalidated a court order that perpetually enjoined the named party, who had published a newspaper containing articles found to violate a state nuisance statute, from producing any future "malicious, scandalous or defamatory" publication. ***Id.***, at 706. ***Near***, therefore, involved a true restraint on future speech—a permanent injunction. So, too, did ***Organization for a Better Austin v. Keefe***, 402 U.S. 415, 91 S. Ct. 1575, 29 L. Ed.2d 1 (1971), and ***Vance v. Universal Amusement Co.***, 445 U.S. 308, 100 S. Ct. 1156, 63 L. Ed.2d 413 (1980) (*per curiam*), two other cases cited by petitioner. In ***Keefe***, we vacated an order "**enjoining** petitioners from distributing leaflets anywhere in the town of Westchester, Illinois." 402 U.S., at 415, 91 S. Ct., at 1576 (emphasis added). And in ***Vance***, we struck down a Texas statute that authorized courts, upon a showing that obscene films had been shown in the past, to issue an injunction of indefinite duration prohibiting the future exhibition of films that have not yet been found to be obscene. 445 U.S., at 311, 100 S. Ct., at 1158–1159. ***See also New York Times Co. v. United States***, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141, 29 L. Ed.2d 822 (1971) (*per curiam*) (Government sought to enjoin publication of the Pentagon Papers).

*Alexander*, 509 U.S. at 550 (emphases in original and formatting altered);

***accord Golden Triangle News, Inc. v. Corbett***, 689 A.2d 974, 979 (Pa.

Cmwlth. 1997) (***Corbett***) (holding that "a prior restraint is a prohibition on

speech in **advance** of its publication or expression, and a restraint must

unduly burden the expression before it will be in violation of Article I, § 7" (citation omitted and formatting altered)).[5]

Instantly, there is no dispute that a permanent injunction can result in a prior restraint on speech. A prior restraint involves an order forbidding **future** communications. ***See Alexander***, 509 U.S. at 550; ***Willing***, 393 A.2d at 1157; ***Corbett***, 689 A.2d at 979. The instant permanent injunction, however, does not involve a prior restraint on speech. Rather, it addresses the existing signs, *i.e.*, preexisting, and not **future**, communications: "The signs posted by [Appellants] on their property are allowed to remain" but turned away from Appellees' property. R.R. at 631a. Because the permanent injunction does not affect future communications, we conclude that Appellants are due no relief on this issue.[6]

### 3. Whether the Injunction is Content-Based or Content-Neutral, *i.e.,* Positioning of the Signs to Face Away From Appellees' Home

We briefly quote the order at issue:

A) The signs posted by [Appellants] on their property are allowed to remain;

---

[5] Although decisions of the Commonwealth Court are not binding on this Court, they may provide persuasive authority. ***See Maryland Cas. Co. v. Odyssey***, 894 A.2d 750, 756 n.2 (Pa. Super. 2006).

[6] We discuss recent Supreme Court and Third Circuit jurisprudence resolving government restriction of offensive speech, *infra*. ***See, e.g.***, ***Mahanoy Area Sch. Dist. v. B. L. by & through Levy***, 141 S. Ct. 2038, 2046-47 (2021) (***Mahanoy***) (explaining that a student's vulgar speech criticizing her school team and coaches was constitutionally protected). As noted elsewhere, more recent jurisprudence has not balanced a recipient's right to residential privacy against unwanted or unrequested speech.

B) The signs previously posted on [Appellants'] property shall be positioned in such a way that they do not directly face [Appellees'] property; *i.e.*, the fronts of the signs (lettering, etc.) are not to be visible to [Appellees] nor face in the direction of [Appellees'] home. In order to ensure that none of the signs are visible regardless of their positioning, these signs shall be constructed with opaque material.

Am. Order, 10/11/19, R.R. at 631a.

Appellants argue that even if the injunction is not a prior restraint on their speech, the injunction is content-based. Appellants' Brief at 33. Because the injunction is content-based, Appellants assert that the injunction is subject to a strict scrutiny standard of review, and it fails that review. *Id.* at 33-34. Appellants explain that the trial court's injunction is not content-neutral because they are prohibited "from communicating specific messages to [Appellees] because [Appellees] find those messages offensive . . . ." *Id.* at 36.

Appellees counter that because the court's injunction does not refer "to the specific beliefs of [Appellants] on any sign," the injunction is "*prima facie* content neutral." Appellees' Brief at 34. Appellees argue that in **Klebanoff v. McMonagle**, 552 A.2d 677 (Pa. Super. 1988), this Court "reached a near-identical holding on content-neutral enjoinment," by affirming injunctive relief that prohibited demonstrators from picketing in a public street in front of a private property. *Id.*

The trial court reasoned that because the injunction was "clear that all signs, no matter the language or images depicted, may remain but may not

- 20 -

face or target" Appellees' property, the injunction was content-neutral. Trial Ct. Op. & Order, 9/12/19, at 12, R.R. at 629a.

## Background

Initially, the general rule is that the government cannot censor offensive speech in the open/free marketplace of speech. The burden is on the viewer to avoid offensive speech. *Snyder v. Phelps*, 562 U.S. 443, 459 (2001);[7] *Erznoznik v. Jacksonville*, 422 U.S. 205, 210-11 (1975); *Cohen v. California*, 403 U.S. 15, 21 (1971).

Courts "have long recognized that each medium of expression presents special First Amendment problems." *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 748 (1978). "Each method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981) (footnote omitted and formatting altered). Therefore, the analytical

---

[7] The *Snyder* Court explained as follows:

> In most circumstances, the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, the burden normally falls upon the viewer to avoid further bombardment of his sensibilities simply by averting his eyes. As a result, the ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.

*Snyder*, 562 U.S. at 459 (citations omitted and formatting altered).

- 21 -

framework for billboards may or may not be identical to the framework for school speech, signs, a gag order, or picketing. *Compare id.*, *with Mahanoy*, 141 S. Ct. at 2044-45; *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) (*Gilleo*);[8] *S.B. v. S.S.*, 243 A.3d 90, 104 (Pa. 2020); *Klebanoff*, 552 A.2d at 678; *see also SmithKline Beecham Corp. v. Stop Huntingdon Animal Cruelty USA*, 959 A.2d 352, 356-57 (Pa. Super. 2008) (*SmithKline*).

Further, the subject matter of the speech may modify the analytical framework. For example, "speech on matters of public concern is at the heart of the First Amendment's protection." *Snyder*, 562 U.S. at 451-52 (citation

---

[8] In *Gilleo*, the High Court noted the distinctive problems presented by a municipal ordinance banning almost all outdoor signs on private property:

> While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs— just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise. However, because regulation of a medium inevitably affects communication itself, it is not surprising that we have had occasion to review the constitutionality of municipal ordinances prohibiting the display of certain outdoor signs.

*Gilleo*, 512 U.S. at 48 (citations omitted). The *Gilleo* Court noted that "a person who puts up a sign at her residence often intends to reach **neighbors**, an audience that could not be reached nearly as well by other means." *Id.* at 57 (emphasis in original and footnote omitted). In any event, as discussed *infra*, a municipal ordinance differs from an injunction.

- 22 -

omitted and formatting altered). Speech on matters of private concern, in contrast, are subject to lesser protections.[9] *Id.* at 452.

---

[9] The *Snyder* Court explained as follows:

> The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.

> Not all speech is of equal First Amendment importance, however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous. That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: There is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose the risk of a reaction of self-censorship on matters of public import.

*Snyder*, 562 U.S. at 452 (citations omitted and formatting altered).

Different limitations also apply to obscene or commercial speech. *See Davenport*, 551 U.S. at 188 (stating, "[f]or example, speech that is obscene or defamatory can be constitutionally proscribed because the social interest in order and morality outweighs the negligible contribution of those categories of speech to the marketplace of ideas." (citation omitted)); *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980) (holding the "Constitution . . . accords a lesser protection to commercial speech" (citation omitted)).

In *Mahanoy*, for example, the United States Supreme Court explained that the speech at issue was not obscene:

> Consider B.L.'s speech. Putting aside the vulgar language, the listener would hear criticism, of the team, the team's coaches, and the school—in a word or two, criticism of the rules of a community of which B.L. forms a part. This criticism did not involve features that would place it outside the First Amendment's ordinary protection. B.L.'s posts, while crude, did not amount to fighting

In addition to the subject matter of the speech, the nature of the forum at issue may alter the analytical framework. *See S.B.*, 243 A.3d at 104 (noting, "First Amendment freedoms must be applied in light of the special characteristics of the relevant environment" (citation omitted and formatting altered)); *see also Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 189 (2007) (stating it is "black-letter law that, when the government permits speech on government property that is a nonpublic forum, it can exclude speakers on the basis of their subject matter" (citation omitted)); *Gilleo*, 512 U.S. at 58 (noting a "special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to **speak** there" (emphasis in original and citations omitted)); *see generally Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983). For example, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Morse v. Frederick*, 551 U.S. 393, 404-05 (2007); *accord Mahanoy*, 141 S. Ct. at 2044-45.

---

words. And while B.L. used vulgarity, her speech was not obscene as this Court has understood that term. To the contrary, B.L. uttered the kind of pure speech to which, were she an adult, the First Amendment would provide strong protection.

*Mahanoy*, 141 S. Ct. at 2046-47 (citations omitted).

The right to free speech also includes the right to listen to or receive speech.[10] *Snyder*, 562 U.S. at 459-60; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (stating, "freedom of speech presupposes a willing speaker. But where a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both" (formatting altered)); *accord PG Pub. Co. v. Aichele*, 705 F.3d 91, 100 n.9 (3d Cir. 2013). Additionally, Pennsylvania recognizes a right to privacy that includes the right to be free from unwanted

---

[10] In *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), the Supreme Court of the United States explained that

> the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. In keeping with this principle, we have held that in a variety of contexts the Constitution protects the right to receive information and ideas. This right is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution, in two senses. First, the right to receive ideas follows ineluctably from the **sender's** First Amendment right to send them: The right of freedom of speech and press embraces the right to distribute literature, and necessarily protects the right to receive it. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.
>
> More importantly, the right to receive ideas is a necessary predicate to the **recipient's** meaningful exercise of his own rights of speech, press, and political freedom.

*Pico*, 457 U.S. at 866-67 (emphases in original, citations omitted, and formatting altered).

speech, which we discuss in further detail, *infra*. **See Klebanoff**, 552 A.2d at 679.

Instantly, the alleged state action at issue, the trial court's order granting a permanent injunction, may change the analytical framework. For example, the analysis for a municipal ordinance is different than the analysis for a court injunction. **Madsen**, 512 U.S. at 764; **see also Gilleo**, 512 U.S. at 50-51 (discussing the two analyses for challenging a municipal ordinance regulating signs on private property).

### Standard of Review

The "standard of review is *de novo* and our scope of review is plenary." **S.B.**, 243 A.3d at 104 (citation omitted). "In conducting our inquiry, we acknowledge that in cases raising First Amendment issues an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." **Id.** (citation omitted and formatting altered). We next summarize the applicable law addressing the existence of a state action and resolving whether a state action is content-based or content-neutral.

### Existence of a State Action

The First Amendment "prohibits only **governmental** abridgment of speech. [It] does not prohibit **private** abridgment of speech." **Manhattan Comm'n Access Corp. v. Halleck**, 139 S. Ct. 1921, 1928 (2019) (emphases

in original and citations omitted); *see also Crozer Chester Medical Ctr. v. May*, 506 A.2d 1377, 1380 (Pa. Super. 1986). Article I, section 7 of the Pennsylvania Constitution similarly prohibits governmental "intrusion upon an individual's right of free speech." *W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 485 A.2d 1, 6 (Pa. Super. 1984) (stating "there is no historical basis for concluding that the framers of the [Pennsylvania] Constitution intended to reach the owners of purely private property when they adopted the original free speech provisions of the Constitution" (footnote omitted and formatting altered)). Therefore, the threshold inquiry is whether a state action is at issue. *Halleck*, 139 S. Ct. at 1930. A state action includes a court order that infringes upon speech and is issued at the request of a private party in a civil lawsuit. *See, e.g.*, *Madsen*, 512 U.S. at 764; *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964). Based on the foregoing, we conclude that the instant trial court's order granting a permanent injunction constitutes state action.

### Whether the Governmental Restriction on Speech is Content-Based or Content-Neutral

Next, we examine whether the state action restricting speech, such as a court order, is content-based or content-neutral. *See Madsen*, 512 U.S. at 763; *see generally United States v. O'Brien*, 391 U.S. 367 (1968). In determining whether a court order restricting speech is content-based or content-neutral, our Supreme Court provided the following guidance:

- 27 -

It is well-established that content-based restrictions on speech are presumptively unconstitutional and are subject to the strict scrutiny standard, which requires the government to prove that the restrictions are narrowly tailored to serve a compelling state interest.  Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed.

Determining whether a particular restriction on speech is content based or content neutral is not always a simple endeavor.  A restriction is content based if either the face of the regulation or the purpose of the regulation is based upon the message the speaker is conveying.

To the contrary, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

\* \* \*

The High Court has explained that the principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.

*S.B.*, 243 A.3d at 104-06 (citations and footnote omitted  and formatting altered); *accord Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (stating, "government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed" (citations omitted and formatting altered)).

"The government's purpose of the speech restriction is the controlling consideration and, if the purpose is unrelated to the expression of content, the restriction is deemed neutral, even though the speech restriction may have an incidental effect on some speakers or messages, but not others."

*S.B.*, 243 A.3d at 106 (citation omitted); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (noting that "the government's purpose is the controlling consideration" (formatting altered)); *accord Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 902 (Pa. 2020). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is **justified** without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791 (emphasis in original, citations omitted, and formatting altered).

As our Supreme Court observed, "[d]etermining whether a particular restriction on speech is content based or content neutral is not always a simple endeavor." *S.B.*, 243 A.3d at 105. For example,

> laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral. *See, e.g.*, *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S. Ct. 2118, 2128, 80 L. Ed.2d 772 (1984) (ordinance prohibiting the posting of signs on public property "is neutral—indeed it is silent— concerning any speaker's point of view")

*Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994) (*Turner*).

When an injunction restricts the expression of a speaker, that speaker may argue that because the restriction affects the speaker or message, the restriction must be content-based. Courts, however, have rejected that

argument. For example, in *Madsen*, an injunction case, the United States Supreme Court rejected the petitioners' argument that because the court's injunction affected only them, the injunction must be content-based:

> We begin by addressing petitioners' contention that the state court's order, **because** it is an injunction that restricts only the speech of antiabortion protesters, is **necessarily** content or viewpoint based. Accordingly, they argue, we should examine the entire injunction under the strictest standard of scrutiny. **We disagree**. **To accept petitioners' claim would be to classify virtually every injunction as content or viewpoint based.** An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, **and perhaps the speech**, of that group. It does so, however, because of the group's **past** actions in the context of a specific dispute between real parties. The parties seeking the injunction assert a violation of their rights; the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public.

*Madsen*, 512 U.S. at 762 (citation omitted and emphases added).

In *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357 (1997), the High Court resolved a similar issue that also involved injunctive relief. The *Schenck* Court reasoned that "in assessing a First Amendment challenge, a court looks not only at the private claims asserted in the complaint, but also inquires into the governmental interests that are protected by the injunction, which may include an interest in public safety and order." *Schenck*, 519 U.S. at 375 (citations omitted). The injunction at issue had a "cease and desist" provision that prevented petitioners from speaking with individuals who indicated they did not want to be "counseled" "in an attempt to persuade them not to get an abortion." *Id.* at 363-64. The petitioners

argued that the "cease and desist" provision was "content based, because it allow[ed] a clinic patient to terminate a protester's right to speak based on, among other reasons, the patient's disagreement with the message being conveyed." *Id.* at 384. Like the *Madsen* Court, the *Schenck* Court rejected the petitioners' argument because the injunction was directed only against the petitioners and was a direct result of the petitioners' past actions. *Id.* at 384-85; *see also Bruni v. City of Pittsburgh*, 941 F.3d 73, 87 (3d. Cir. 2019) (holding that an **ordinance**, which banned congregating, patrolling, picketing, and demonstrating outside health care facilities, was content-neutral because regulations of those acts are "based on the manner in which expressive activity occurs, not its content").

In *Klebanoff*, this Court affirmed a permanent injunction that prevented the defendants "from picketing or demonstrating in the street directly in front of" the plaintiff's home. *Klebanoff*, 552 A.2d at 677. The *Klebanoff* Court first acknowledged that public streets and sidewalks are public fora. *Id.* at 678. The Court reasoned that because the permanent injunction banned all picketing of the plaintiff's "house without reference to the content or subject matter of the protest," the injunction was content-neutral. *Id.* at 678-79. The *Klebanoff* Court, as discussed *infra*, also acknowledged Pennsylvania's substantial interest in protecting an individual's right to privacy of one's home. *Id.* at 679. The Court summarized the evidence that the plaintiff's right to privacy was intruded upon and held the

injunction was constitutionally permissible. *Id.*; *see also Schenck*, 519 U.S. at 375 (holding that courts, when issuing an injunction, must examine the governmental interests involved).

In *SmithKline*, this Court similarly addressed injunctive relief that banned the defendants from "picketing, demonstrating, leafleting, protesting or congregating" at the plaintiffs' homes, among other places.[11] *SmithKline*, 959 A.2d at 356. The *SmithKline* Court noted that the injunction was like the injunction in *Klebanoff* and was similarly content-neutral:

> This means the speech is not regulated due to a disagreement with the message conveyed. A restriction on speech that is not content based is still considered neutral even if it might affect some speakers or messages and not others. The . . . injunction, on its face, does not seek to ban any subject matter from being protested. The purpose in enacting the restrictions is to prevent the excessive tactics used by the protesters, not to stifle the message itself.

*Id.* at 356 n.2 (citations omitted); *see also id.* at 357 (citing *Madsen*, 512 U.S. at 765).[12]

But even if the court's order appears content-neutral on its face, we must determine whether "it is nevertheless a content-based regulation of

---

[11] *SmithKline* also involved injunctive relief granted in favor of the plaintiffs' employer, as well as the individual plaintiffs, who were employees. *SmithKline*, 959 A.2d at 356. For ease of discussion, when we refer to the plaintiffs, we refer to the individual plaintiffs.

[12] The defendants did not argue that the injunction was content-based, but the *SmithKline* addressed whether the injunction was content-based or content-neutral. *Id.* at 356 n.2

speech because it cannot be justified without reference to the content of the regulated speech." **Reed**, 576 U.S. at 164 (explaining that, "our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys" (citation omitted and formatting altered)); **see also Ward**, 491 U.S. at 791. The government's intent or motive is not a factor. **Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.**, 502 U.S. 105, 117 (1991) (holding evidence of improper motive or illicit "intent is not the *sine qua non* of a violation of the First Amendment"). Having summarized the applicable law, we turn to the instant state action at issue.

## The Instant Order is Facially Content-Neutral

Here, state action is involved, as the trial court issued, at Appellees' request, injunctive relief that specifically ordered Appellants to position the signs away from Appellees' property with the front of the signs not visible to Appellees. Order, 9/12/19, at 1; **see, e.g.**, **Madsen**, 512 U.S. at 764; **Sullivan**, 376 U.S. at 265; **Klebanoff**, 552 A.2d at 677. The trial court specified that the justification of the order is to protect Appellees' "right of residential privacy." Trial Ct. Op., 9/12/19, at 12.

Like the injunctions in **SmithKline** and **Klebanoff** that enjoined all picketing or demonstrating in front of the plaintiffs' homes, the instant injunction was also, on its face, content-neutral as it was "without reference to the content or subject matter" of the signs. **See SmithKline**, 959 A.2d at 356 n.2; **Klebanoff**, 552 A.2d at 678. Identical to the injunctions in **SmithKline** and **Klebanoff**, the justification of the instant injunction was to ensure Appellees' constitutional right of residential privacy. **See SmithKline**, 959 A.2d at 357-59; **Klebanoff**, 552 A.2d at 679. The instant order, to paraphrase **Ward**, serves a purpose unrelated to the content of the signs at issue. **See Ward**, 491 U.S. at 791; **see also Turner**, 512 U.S. at 643; **S.B.**, 243 A.3d at 105-06. In sum, the trial court's order is facially content-neutral, as it is unrelated to the content of the speech. **See S.B.**, 243 A.3d at 105-06.

However, under **Reed**, we must also examine whether the trial court's injunction order, although "facially content neutral," can be "justified without reference to the content of the regulated speech." **See Reed**, 576 U.S. at 164 (citation omitted and formatting altered). As set forth above, the trial court ordered that Appellants' signs face away from and not be otherwise visible to Appellees. In **SmithKline**, the injunction barred the defendants from protesting within 100 feet of the plaintiffs' homes. **See SmithKline**, 959 A.2d at 355. In **Klebanoff**, the injunction enjoined the defendants from protesting in front of the plaintiff's home. **See Klebanoff**, 552 A.2d at 677.

Both Courts justified the injunction on the basis that the plaintiffs' right to residential privacy was violated. **See SmithKline**, 959 A.2d at 357-59; **Klebanoff**, 552 A.2d at 679. Because a complete bar on protesting without reference to the content of the defendant's speech was held to be a content-neutral restriction, it follows that a similar restriction preventing Appellants' signs from being seen because it violated Appellees' right to residential privacy, is also content-neutral.[13] **See SmithKline**, 959 A.2d at 356-59; **Klebanoff**, 552 A.2d at 678-79, 682.

Furthermore, the United States Supreme Court has rejected Appellants' argument that because the injunction restricts speech that Appellees find offensive, the injunction must be content-based. **See Madsen**, 512 U.S. at 762; **accord Schenck**, 519 U.S. at 384; **cf. Bruni**, 941 F.3d at 87. The **Madsen** Court, as discussed above, rejected the antiabortion protestors' argument that because the injunction restricted their speech, the injunction was "necessarily content or viewpoint based." **Madsen**, 512 U.S. at 762. To accept that argument, the High Court ruled, "would be to classify virtually every injunction as content or viewpoint based" **even if** the injunction affects speech. **Id.**; **accord Schenck**, 519 U.S. at 384 (holding that an injunction's

---

[13] We acknowledge that the mode of expression in **SmithKline** and **Klebanoff**, *i.e.*, picketing or demonstrating on public fora, differs from the instant mode of expression, *i.e.*, posting of signs on private property. **See Gilleo**, 512 U.S. at 45. But our focus at this stage is whether the order is content-neutral or content-based. Whether the instant trial court's injunction passes constitutional muster is discussed *infra*.

"cease and desist" provision was content-neutral despite banning the speech of only antiabortion protestors). Therefore, we conclude Appellants' argument that the injunction is content-based is due no relief. We next address whether the trial court's injunction passes constitutional scrutiny.

### 4. Whether the Injunction, Even If Content-Neutral, Fails Scrutiny

Appellants lastly argue that even if the injunction is content-neutral, it still fails. Appellants' Brief at 39. Appellants assert that the injunction fails to further a significant governmental interest by distinguishing the three cases the trial court relied on: *Frisby v. Schultz*, 487 U.S. 474 (1988), *Klebanoff*, and *Rouse Phila. Inc. v. Ad Hoc '78*, 417 A.2d 1248 (Pa. Super. 1979) (*Rouse*). *Id.* at 40-47.

Appellants also argue that the injunction, even if it furthers a significant governmental interest, is not narrowly tailored. *Id.* at 51. Appellants reason that the trial court's injunction cannot be both content-neutral and narrowly tailored. *Id.* Appellants assert that a content-neutral injunction "must leave open ample alternative means of communication." *Id.* at 53. In their view, the trial court's injunction did not leave Appellants those alternative means of communication. *Id.* Appellants point out that the right to free speech protects both the speaker's ability to convey their message and the speaker's ability to ensure the message reaches the intended recipients. *Id.* Appellants therefore reason that if they cannot post signs protesting Appellees' anti-Semitic behavior in a manner that can be seen by the intended recipients, *i.e.,*

Appellees, Appellants have no alternative means of communicating their message. *Id.* at 54-55.

Appellees counter that Appellants' signs are an "unwanted invasion of [their] privacy in the occupancy of their home." Appellees' Brief at 31. Appellees assert that all they see from the back of their home and backyard are Appellants' signs. *Id.* at 32. Appellees claim they stopped using their backyard and are afraid to go outside. *Id.* In Appellees' view, the trial court correctly adhered to the reasoning of **Klebanoff** and **Rouse**. *Id.* at 33. Appellees contend that Appellants have ample alternatives means of communicating their speech. *Id.* at 35.

The trial court, relying on **Klebanoff**, **Rouse**, and **Frisby**, reasoned that Appellants' actions violated Appellees' right to residential privacy. Trial Ct. Op., 9/12/19, at 9-12, R.R. at 626a-29a. Critically, the trial court asserted that its time, place, and manner restrictions were proper. *Id.* at 9, R.R. at 626a. In the trial court's view, its injunction was narrowly tailored because Appellants are "free to continue to post signs on [their] property with any message [they] deem[] appropriate so long as they do not target or face" Appellees' property. *Id.* at 11, R.R. at 628a. We next summarize the applicable law.

## Background

Generally, governmental regulations of speech "that are unrelated to the content of speech are subject to an intermediate level of scrutiny because

in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." **S.B.**, 243 A.3d at 105 (citation omitted). For example, a gag order may be constitutional if it complies with the well-settled **O'Brien** test.[14]  **See id.** (summarizing the four-part **O'Brien** test).

---

[14] In **S.B.**, our Supreme Court addressed the constitutionality of a court order, specifically, a gag order that prohibited a party and her counsel from speaking publicly about the case.  **Id.** at 100.

> A content-neutral regulation of speech passes constitutional muster if it satisfies the following four-part standard set forth by the High Court in **United States v. O'Brien**, [391 U.S. 367 (1968)]: (1) the regulation was promulgated within the constitutional power of government; (2) the regulation furthers an important or substantial governmental interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

> So long as the regulation of speech is not a means, subtle or otherwise, of exercising content preference, it is not presumed invalid.

> Restrictions on the time, place and manner of expression, whether oral, written or symbolized by conduct, are a form of a content-neutral regulation of speech.  These restrictions may make it more difficult for an individual to engage in a desired speech-related activity by targeting, *inter alia*, the means of speech or the method of communication, but they do not target the content of the message ultimately conveyed.  Time, place, and manner restrictions are valid, provided that they: (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest unrelated to speech; and (3) leave open ample alternative channels for communication of the information.

See **S.B.**, 243 A.3d at 105-06 (most citations and footnote omitted); **see also Gilleo**, 512 U.S. at 56-59 (rejecting the time, place, and manner restriction

An injunction, however, requires a "more stringent application of general First Amendment principles" than the ***O'Brien*** test. ***Madsen***, 512 U.S. at 765. In ***Madsen***, the United States Supreme Court explained why a court injunction was subject to greater scrutiny than a legislative ordinance:

> If this were a content-neutral, generally applicable statute, instead of an injunctive order, its constitutionality would be assessed under the standard set forth in ***Ward*** . . . , and similar cases. Given that the forum around the clinic is a traditional public forum, ***see Frisby*** . . . , we would determine whether the time, place, and manner regulations were narrowly tailored to serve a significant governmental interest.
>
> There are obvious differences, however, between an injunction and a generally applicable ordinance. Ordinances represent a legislative choice regarding the promotion of particular societal interests. Injunctions, by contrast, are remedies imposed for violations (or threatened violations) of a legislative or judicial decree. Injunctions also carry greater risks of censorship and discriminatory application than do general ordinances. There is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Injunctions, of course, have some advantages over generally applicable statutes in that they can be tailored by a trial judge to afford more precise relief than a statute where a violation of the law has already occurred.
>
> We believe that these differences **require a somewhat more stringent** application of general First Amendment principles in this context. In past cases evaluating injunctions restricting speech, we have relied upon such general principles while also seeking to ensure that the injunction was no broader than necessary to achieve its desired goals. Our close attention to the fit between the objectives of an injunction and the restrictions it imposes on speech is consistent with the general rule, quite apart from First Amendment considerations, that injunctive relief should

---

on ordinance banning nearly all signs on private property because it failed to provide alternative mediums of communication).

> be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs. Accordingly, when evaluating a content-neutral injunction, **we think that our standard time, place, and manner analysis is not sufficiently rigorous**. We must ask instead whether the challenged provisions of the injunction **burden no more speech than necessary** to serve a **significant government interest**.

*Id.* at 764-65 (footnote and most citations omitted, formatting altered, and emphases added); *accord SmithKline*, 959 A.2d at 356-57. We discuss *Madsen* in further detail, *infra*.[15]

### Significant Governmental Interest of Residential Privacy

As the *Madsen* Court set forth above, an injunction must serve a significant governmental interest. Although the general rule is that the burden is on the viewer to avoid offensive speech, one exception to that general rule is when that speech is unwanted and uninvited in the viewer's home. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 575 (2011) (holding that "personal privacy even in one's own home receives ample protection from the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors" (citation omitted and formatting altered)). This is known as the captive audience doctrine. *Snyder*, 562 U.S. at 459 (explaining that "as a general matter, we have applied the captive audience doctrine only sparingly to protect unwilling listeners from protected speech" (formatting altered)). The protection of one's personal, residential privacy, *i.e.*, a captive audience,

---

[15] *Madsen* was filed after this Court's decisions in *Klebanoff* and *Rouse*.

is considered a significant governmental interest, which the **SmithKline** and **Klebanoff** Courts recognized exists in Pennsylvania. **See Frisby**, 487 U.S. at 484; **SmithKline**, 959 A.2d at 357; **Klebanoff**, 552 A.2d at 679, 681; **cf. Gilleo**, 512 U.S. at 54 (noting that the municipal ordinance that nearly completely banned signs posted on private property, almost "foreclosed a venerable means of communication"; the signs at issue, however, were not directed to a captive audience).

In **Frisby**, the plaintiffs were anti-abortion activists who picketed on a public street outside a doctor's home in the town of Brookfield, Wisconsin. **Frisby**, 487 U.S. at 476. Subsequently, the town enacted an ordinance banning all residential picketing, specifically, "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield."[16] **Id.** at 477 (citation omitted). The ordinance stated that its primary purpose was

---

[16] The **Frisby** Court defined "picketing" as "posting at a particular place, a characterization in line with viewing the ordinance as limited to activity focused on a single residence." **Frisby**, 487 U.S. at 482. "Picketing" has also been defined as follows:

> The demonstration by one or more persons outside a business or organization to protest the entity's activities or policies and to pressure the entity to meet the protesters' demands; esp., an employees' demonstration aimed at publicizing a labor dispute and influencing the public to withhold business from the employer.

Black's Law Dictionary (11th ed. 2019). The conduct at issue in **Rouse** falls within this definition.

- 41 -

the protection and preservation of the home' through assurance that members of the community enjoy in their homes and dwellings a feeling of well-being, tranquility, and privacy [and because] the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants and has as its object the harassing of such occupants.

*Id.* (citations omitted and formatting altered).[17]

The *Frisby* Court explained that a significant government interest is the protection of residential privacy:

The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society. Our prior decisions have often remarked on the unique nature of the home, the last citadel of the tired, the weary, and the sick, and have recognized that preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value.

One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different. That we are often captives outside the sanctuary of the home and subject to objectionable speech does not mean we must be captives everywhere. Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid

---

[17] The plaintiffs sued the town and other defendants, and moved for preliminary injunctive relief, which the district court granted. *Frisby*, 487 U.S. at 478. The appellate court ultimately affirmed, and the High Court granted the defendants' petition for *certiorari*. *Id.* at 479.

Initially, the *Frisby* Court held that the speech at issue was on an issue of public concern, and therefore presumptively protected speech. *Id.* The *Frisby* Court then identified the forum at issue, which was the town's public streets. *Id.* at 479-80. The *Frisby* Court did not challenge the lower courts' prior holdings that the ordinance was content-neutral. *Id.* at 482. The *Frisby* Court therefore examined whether the ordinance was narrowly tailored to serve a significant governmental interest. *Id.*

intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

This principle is reflected even in prior decisions in which we have invalidated complete bans on expressive activity, including bans operating in residential areas. In all such cases, we have been careful to acknowledge that unwilling listeners may be protected when within their own homes. In [**Schneider v. State of New Jersey (Town of Irvington)**, 308 U.S. 147, 162-63 (1939)], for example, in striking down a complete ban on handbilling,[18] we spoke of a right to distribute literature only to one willing to receive it. Similarly, when we invalidated a ban on door-to-door solicitation in [**Martin v. Struthers**, 319 U.S. 141 (1943)], we did so on the basis that the homeowner could protect himself from such intrusion by an appropriate sign that he is unwilling to be disturbed. We have never intimated that the visitor could insert a foot in the door and insist on a hearing. There simply is no right to force speech into the home of an unwilling listener.

**Frisby**, 487 U.S. at 484-85 (some citations omitted and formatting altered).[19]

---

[18] Handbilling is the distribution, by hand, of literature, such as advertisements. **Schneider**, 308 U.S. at 154.

[19] The **Frisby** Court therefore held as follows:

The First Amendment permits the government to prohibit offensive speech as intrusive when the captive audience cannot avoid the objectionable speech. The target of the focused picketing banned by the Brookfield ordinance is just such a captive. The resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech. Thus, the evil of targeted residential picketing, the very presence of an unwelcome visitor at the home, is created by the medium of expression itself. Accordingly, the Brookfield ordinance's complete ban of that particular medium of expression is narrowly tailored.

**Id.** at 487-88 (citations omitted and formatting altered).

We have previously stated the facts of **Klebanoff**, which provided guidance in determining whether a governmental restriction on speech is content-neutral. In addressing the government's interest, the **Klebanoff** Court held that "courts of this Commonwealth can enjoin activity which violates an individual's residential privacy, and that the injunction in this case, which restricts the place where the expressive activity can occur, is a proper time, place and manner restriction." **Klebanoff**, 552 A.2d at 678. Relying on **Frisby**, **supra**, the **Klebanoff** Court recognized that only "weighty and substantial reasons" can justify a governmental restriction on the use of public fora, such as the residential street at issue. **Id.**

The **Klebanoff** Court noted that the

this injunction serves to protect a substantial interest recognized in both Pennsylvania law, and in the United States Constitution. It protects what has been variously called the individual's right of privacy, the right to be free from intrusion upon one's solitude or seclusion, or the right to be left alone.

The public's interest in protecting the well-being, tranquility, and privacy of the home is of the highest order. The home has been called the last citadel of the tired, the weary, and the sick. The home serves to provide, among other things, a [refuge] from today's complex society where we are inescapably captive audiences for many purposes. **Rowan v. United States Post Office**, 397 U.S. 728, 738, 90 S. Ct. 1484, 1491, 25 L. Ed.2d 736 (1970). Normally, outside of the home, consonant with the Constitution, we expect individuals to avoid unwanted speech, simply by averting their eyes. But such avoidance within the walls of one's own house is not required. Therefore, the courts have repeatedly held that individuals are not required to welcome unwanted speech and the State may act to avoid such intrusions into the privacy of the dwelling place.

*Id.* at 679 (formatting altered and most citations omitted). In sum, Pennsylvania's right to privacy includes the right to not be forced to listen to unwanted and uninvited speech.[20] *See id.*; *see also Sorrell*, 564 U.S. at 575; *Snyder*, 562 U.S. at 459-60; *Frisby*, 487 U.S. at 484-85, 488; *Pico*, 457 U.S. at 866-67.

The *SmithKline* Court similarly affirmed a permanent injunction that prevented the defendants from picketing within 100 feet of the plaintiffs' homes. *SmithKline*, 959 A.2d at 359. The Court, citing *Frisby* and *Klebanoff*, acknowledged Pennsylvania's governmental interest in protecting an individual's residential privacy. *See id.* at 357. The *SmithKline* Court noted that the defendants had graffitied the plaintiffs' homes, glued the door locks shut, used bullhorns, and shouted obscenities and threats, among other actions. *Id.* at 358-59. Therefore, the *SmithKline* Court concluded, "ample evidence" of record existed that the defendants had "intruded upon the privacy interests" of the plaintiffs.[21] *Id.* at 359.

---

[20] The *Klebanoff* Court concluded that the record established that the picketing of the plaintiff's home significantly intruded upon the plaintiffs' privacy. *Klebanoff*, 552 A.2d at 679-80. In the Court's view, the record established that the picketing caused emotional stress to the plaintiff's family, impacted the quiet enjoyment of their home, and interfered with their holidays and family routines. *Id.* After noting that "[e]ven a complete ban on all expressive activity in a traditional public forum is permissible if substantial privacy interests are being invaded in an essentially intolerable manner," the Court held that the injunction was constitutionally permissible. *Id.* at 680 (citation omitted).

[21] In contrast, *Rouse* did not address the governmental interest in residential privacy. In *Rouse*, the plaintiff obtained a temporary restraining order

In **Madsen**, the United States Supreme Court addressed a similar state court injunction involving targeted speech and the governmental interest in residential privacy. In **Madsen**, pro-life activists "picketed and demonstrated [on] the public street" that gave access to a Florida abortion clinic. **Madsen**, 512 U.S. at 758. A Florida state court permanently enjoined the activists from "blocking or interfering with public access to the clinic, and from physically abusing persons entering or leaving the clinic." **Id.** The clinic, however, sought a broader injunction because the activists, among other things, had continued to impede access to the clinic and had picketed in front of the clinic employees' private residences. **Id.** at 758-59.

The trial court agreed and enjoined the activists from entering a 36-foot buffer zone surrounding the clinic. **Id.** at 768-69. This buffer zone included the public access street to the clinic as well as private property surrounding the clinic. **Id.** at 769. The amended injunction also prohibited the activists from using "images observable to or within earshot of the patients" inside the clinic. **Id.** at 760. The trial court also enjoined the activists from "picketing,

_____

against the defendant from picketing from within the public areas inside a shopping mall, the entrance to a department store located in the shopping mall, an exterior courtyard area, and the sidewalk surrounding the shopping mall. **Rouse**, 417 A.2d at 1251-52. The trial court held the defendant in contempt of the order. **Id.** at 1248. The defendant appealed and argued, among other things, that the order violated his "First Amendment rights of freedom of speech and expression." **Id.** at 1252. The **Rouse** Court disagreed because the order did not limit the defendant's "expression of the ideas" but instead limited the conduct in which the defendant chose to express those ideas. **Id.** at 1254.

demonstrating, or using sound amplification equipment within 300 feet of the [private] residences of clinic staff." *Id.* at 774.

The *Madsen* Court initially held that the amended injunction was content-neutral.[22] *Id.* at 763-64. It also agreed that the activists' picketing was "directed primarily at patients and staff of the clinic." *Id.* at 769 (distinguishing between generally disseminated communication such as handbilling and solicitation that may not be banned in public fora, and focused picketing, which can be banned).

With respect to the private property encompassed by the 36-foot buffer zone, the *Madsen* Court invalidated that part of the injunction. *Id.* at 771. The *Madsen* Court reasoned that there was no "evidence that [the activists] standing on the private property have obstructed access to the clinic, blocked vehicular traffic, or otherwise unlawfully interfered with the clinic's operation . . . ." *Id.* The *Madsen* Court therefore held that the 36-foot buffer zone, to

---

[22] Specifically, the *Madsen* Court reasoned as follows:

> That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group whose conduct violated the court's order happen to share the same opinion regarding abortions being performed at the clinic. In short, the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based.

*Madsen*, 512 U.S. at 763. Thus, an injunction enjoining the communicating of a particular viewpoint, *e.g.*, pro-life or anti-racism, does not presumptively render the instant trial court's injunction content or viewpoint based. *See id.*

the extent it applied to the private property surrounding the clinic, "burdens

more speech than necessary to protect access to the clinic." *Id.*

The *Madsen* Court also overturned the portion of the trial court's

injunction that prohibited the activists from using "images observable" to any

patients inside the clinic:

> Clearly, threats to patients or their families, however communicated, are proscribable under the First Amendment. But rather than prohibiting the display of signs that could be interpreted as threats or veiled threats, the state court issued a blanket ban on all "images observable." This broad prohibition on all "images observable" burdens more speech than necessary to achieve the purpose of limiting threats to clinic patients or their families. Similarly, if the blanket ban on "images observable" was intended to reduce the level of anxiety and hypertension suffered by the patients inside the clinic, it would still fail. The only plausible reason a patient would be bothered by "images observable" inside the clinic would be if the patient found the expression contained in such images disagreeable. But it is much easier for the clinic to pull its curtains than for a patient to stop up her ears, and no more is required to avoid seeing placards through the windows of the clinic. This provision of the injunction violates the First Amendment.

*Id.* at 773.

With respect to the portion of the trial court's injunction that prohibited

the anti-abortion activists from picketing within a 300 feet zone of the clinic

employees' private homes, the *Madsen* Court held that the zone was too

large:

> As for the picketing, our prior decision upholding a law banning targeted residential picketing remarked on the unique nature of the home, as the last citadel of the tired, the weary, and the sick. We stated that the State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.

But the 300–foot zone around the residences in this case is much larger than the zone provided for in the ordinance which we approved in **Frisby**. The ordinance at issue [in **Frisby**] made it unlawful for any person to engage in picketing before or about the residence or dwelling of any individual. The prohibition was limited to focused picketing taking place solely in front of a particular residence. By contrast, the 300–foot zone would ban general marching through residential neighborhoods, or even walking a route in front of an entire block of houses. The record before us does not contain sufficient justification for this broad a ban on picketing; it appears that a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result.

**Id.** at 775 (citations omitted and formatting altered).[23]

In sum, the **Madsen** Court struck "down as unconstitutional the 36–foot buffer zone as applied to the private property [around] the clinic, the 'images observable' provision, . . . and the 300–foot buffer zone around the [clinic employees' private] residences, because [those] provisions [swept] more broadly than [was] necessary to accomplish the permissible goals of the injunction." **Id.** at 776. Having summarized the applicable law, we next address the instant trial court's injunction.

---

[23] We comment that the **Madsen** Court's reasoning must also be considered in light of the heightened scrutiny of an injunction, as compared to the ordinance in **Frisby**. **See Madsen**, 512 U.S. at 764-65. We add that **Madsen** involved targeted picketing to a private residence, as compared to the untargeted signs at issue in **Gilleo**. **See Gilleo**, 512 U.S. at 55 (citing and quoting **Frisby** for the proposition that "picketing focused upon individual residence is 'fundamentally different from more generally directed means of communication that may not be completely banned in residential areas,'" *i.e.*, signs (citation omitted)).

## The Instant Trial Court Did Not Apply the Heightened Scrutiny Standard in Enjoining Appellants' Targeted Speech of Appellees

With respect to Appellants' argument that the injunction does not further a significant government interest, they are incorrect. In **Frisby**, the United States Supreme Court remarked that all members of the community have a right to residential privacy, which includes the right to "enjoy within their own walls . . . an ability to avoid . . . unwanted speech . . . ." **See Frisby**, 487 U.S. at 484-85. Pennsylvania has similarly recognized this right and that courts may enjoin any activity violating an individual's right to residential privacy. **See Klebanoff**, 552 A.2d at 678; **accord SmithKline**, 959 A.2d at 357-58. A right to residential privacy may be violated when a listener is subjected to targeted speech, including picketing and protesting. **See Frisby**, 487 U.S. at 484-85; **Klebanoff**, 552 A.2d at 678-80; **accord SmithKline**, 959 A.2d at 359. As previously set forth above, Appellant Husband testified that Appellants' signs targeted Appellees. Trial Ct. Op., 9/12/19, at 8-9, R.R. at 625a-26a (citations omitted); **accord** Ex. E to Appellants' Mot. for Summary J., at 41, 47, 54, 61, R.R. at 244a, 250a, 257a, 264a.

Because an injunction could further the significant governmental interest in Appellees' right to residential privacy, the trial court should have applied the heightened, more rigorous standard under **Madsen** in tailoring its injunction. **See Madsen**, 512 U.S. at 765 (holding, "when evaluating a content-neutral injunction, we think that our standard time, place, and

manner analysis is not sufficiently rigorous"). The instant trial court, however, instead applied the time, place, and manner test in justifying its injunction. *See* Trial Ct. Op. & Order, 9/12/19, at 9, R.R. at 626a. Like the *Madsen* Court, which closely reviewed the terms of the state court's injunction to the extent it impacted private property, including the clinic employees' right to residential privacy, the instant trial court should have also similarly tailored its injunction to ensure it "burden[ed] no more speech than necessary to serve" Pennsylvania's right to residential privacy. *See Madsen*, 512 U.S. at 765; *see also Pap's A.M.*, 812 A.2d at 605 (noting that Pennsylvania's right to freedom of expression is broader than the First Amendment). Therefore, because the trial court applied an incorrect legal standard, we must vacate the trial court's judgment and amended injunction and remand for further proceedings.[24] *See Madsen*, 512 U.S. at 765. For these reasons, we vacate the judgment, and vacate the injunction.

---

[24] When a trial court has applied an incorrect legal standard, we should vacate and remand. For example, in *In re M.B.*, 228 A.3d 555 (Pa. Super. 2020), because the trial court improperly held the appellant to a higher standard of proof, the *M.B.* Court vacated the order and remanded for further proceedings. *M.B.*, 228 A.3d at 577; *see also Barak v. Karolizki*, 196 A.3d 208, 221, 224 (Pa. Super. 2018) (vacating and remanding to have trial court apply correct law when it improperly applied the preliminary injunction standard to *lis pendens*); *New Milford Twp. v. Young*, 938 A.2d 562, 566 (Pa. Cmwlth. 2007) (vacating permanent injunction and remanding because trial court failed to hold the hearing required by law).

The same principle also binds this Court. In *Commonwealth v. Clay*, 64 A.3d 1049 (Pa. 2013), our Supreme Court held that when "a reviewing court applies the incorrect legal standard, our court generally will remand the matter with appropriate directions." *Clay*, 64 A.3d at 1057 (citation omitted).

Because the Superior Court in **Clay** applied the incorrect standard of review, our Supreme Court "reverse[d] the decision of the Superior Court and remand[ed] this matter to the Superior Court for reconsideration of [the] claims under the appropriate abuse of discretion standard." **Id.**

Federal courts have similarly remanded to have the lower courts apply the proper legal standard. **See, e.g.**, **Roberts v. City of Honolulu**, 938 F.3d 1020, 1022 (9th Cir. 2019) (explaining that "[b]ecause we agree that the district court did not apply the correct legal standard . . . , we vacate and remand for application of the correct legal standard" (formatting altered)); **Genband US LLC v. Metaswitch Networks Corp.**, 861 F.3d 1378, 1381 (Fed. Cir. 2017) (holding that "where it is not evident that a district court has applied the correct legal standard in exercising its discretion, we may vacate and remand for the district court to do so in the first instance, especially where further factual findings may be warranted under the correct legal standard" (citation omitted and formatting altered)); **G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.**, 822 F.3d 709, 715 (4th Cir. 2016) (stating, "because we conclude that the district court used the wrong evidentiary standard in assessing [the] motion for a preliminary injunction, we vacate its denial and remand for consideration under the correct standard" (formatting altered)), *vacated and remanded*, 137 S. Ct. 1239 (2017); **Holton v. City of Thomasville Sch. Dist.**, 425 F.3d 1325, 1356 (11th Cir. 2005) (remanding for reconsideration because "we conclude that the court failed to apply the correct legal standard and that this error tainted its factual findings on this issue"); **see also Pullman-Std. v. Swint**, 456 U.S. 273, 291 (1982) (explaining that "when an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings" (formatting altered)); **Willis v. Town of Marshall, N.C.**, 426 F.3d 251, 267 (4th Cir. 2005) (vacating district court's denial of preliminary injunction and remanding for reconsideration because district court failed to address equal protection claim); **Hamad v. Woodcrest Condominium Ass'n**, 328 F.3d 224, 233-34 (6th Cir. 2003) (rejecting argument that appellate court should issue preliminary injunction despite district court's failure to apply the correct law); **Real Truth About Obama, Inc. v. Federal Election Comm'n**, 796 F. Supp.2d 736, 744 (E.D. Va. 2011) (construing High Court's vacate and remand mandate as instruction to consider whether subsequent Supreme Court caselaw would alter its holding).

For example, in **Lair v. Bullock**, 798 F.3d 736 (9th Cir. 2015), the district court "applied the wrong legal standard" in granting a permanent injunction resolving a First Amendment issue regarding campaign contributions. **Lair**, 798 F.3d at 740, 749. Because the district court applied an incorrect legal

Judgment vacated. Trial court's amended October 11, 2019 order and September 12, 2019 order granting injunctive relief vacated and we remand for further proceedings.[25] Jurisdiction relinquished.

_____

standard, the **Lair** Court held that the district court "abused its discretion when it entered a permanent injunction, and we remand for the district court to apply the correct standard." **Id.** at 748 (footnote omitted); **accord Stormans, Inc. v. Selecky**, 586 F.3d 1109, 1142 (9th Cir. 2009) (vacating preliminary injunction involving First Amendment issue and remanding to have district court apply the "rational basis level of scrutiny" because the district court "abused its discretion in applying an erroneous legal standard of review"). Similarly, in **Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n**, 263 F.3d 379 (4th Cir. 2001) (**Virginia Soc'y**), _overruled on other grounds by_ **The Real Truth About Abortion, Inc. v. Federal Election Comm'n**, 681 F.3d 544 (4th Cir. 2012), the Circuit Court vacated the district court's nationwide injunction regarding a First Amendment issue because it was too broad and remanded for the district court to amend it. **Virginia Soc'y**, 263 F.3d at 394.

Here, similar to the district courts in **Lair** and **Stormans**, as well as the trial court in **M.B.**, and this Court in **Clay**, the instant trial court applied an incorrect legal standard. **See Clay**, 64 A.3d at 1057; **M.B.**, 228 A.3d at 577; **accord Lair**, 798 F.3d at 748; **Stormans**, 586 F.3d at 1142. As set forth herein, the instant trial court erroneously applied the less strict "time, place, and manner" **O'Brien** test in justifying its injunction and did not apply the heightened, stricter **Madsen** test. Because the trial court applied an incorrect legal standard, we remand "for the [trial] court to apply the correct standard." **See Lair**, 798 F.3d at 748; **Stormans**, 586 F.3d at 1142; **Clay**, 64 A.3d at 1057; **M.B.**, 228 A.3d at 577; **cf. Virginia Soc'y**, 263 F.3d at 394. Upon application of the correct legal standard, the trial court may decide to deny relief or if it grants relief, may tailor a properly narrowed injunction that may withstand constitutional scrutiny.

[25] Although the Concurring and Dissenting Statement agrees that the trial court applied an incorrect legal standard, it concludes that the relief ordered by the trial court burdened no more speech than necessary and results in harmless error. Concurring and Dissenting Statement at 8. Considering the impact of the instant decision on fundamental constitutional rights, including the First Amendment, we cannot agree that the error was harmless. Additionally, we conclude that the application of an erroneous legal standard requires remand for a proper determination by the trial court. **See** 17

Judge Colins joins the opinion.

Judge Stabile files a concurring and dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/18/2022

---

Standard Pennsylvania Practice 2d § 92:103 (remand to correct errors of law) (citing **In re J. F.**, 408 A.2d 1382, 1387 (Pa. 1979)). The trial court should be given the opportunity to correct its error as it is not for this Court to presuppose what the trial court's decision would be upon applying the proper legal standard. **See In re B.S.**, 861 A.2d 974, 977 (Pa. Super. 2004) (remanding with instructions for the trial court to apply the correct legal standard in an adoption matter); **cf. Osial v. Cook**, 803 A.2d 209, 215 (Pa. Super. 2002) (noting that although this Court could correct the error, the better course of action was to remand for the trial court to decide the matter).